**Richard HAIGH, and Norma Haigh, Plaintiffs,**

v.

**MATSUSHITA ELECTRIC CORPORATION OF AMERICA, d/b/a Panasonic Company, a Delaware corporation, Gerald Willner, Myron Berman, Barry Kanow, Bernie Adamyk, Steve Latini, Steve Gold, Ralph Wolfe, Jeff Kellner, and Gary Weber, Defendants.**

**Civ. A. No. 87–0455–R.**

United States District Court,
E.D. Virginia,
Richmond Division.

Dec. 28, 1987.

Robert L. Freed, John Patrick Griffin, Thomas G. Haskins, Richmond, Va., J.W. Harmon, Jr., for plaintiffs.

Howard W. Dobbins, James V. Meath, Robert D. Perrow, Sarah Hopkins Finley, Williams, Mullen, Christian and Dobbins, P.C., Lynne Jacob, Richmond, Va., for defendants.

## MEMORANDUM AND ORDER

SPENCER, District Judge.

This matter comes before the Court on two motions by defendants. The first, a motion to dismiss, will be granted in part and denied in part. The second, a motion to compel the production of certain tape recordings, will be granted.

## THE MOTION TO DISMISS

### Background

Plaintiff Richard Haigh ("Haigh"), a Virginia citizen, was employed by defendant Matsushita Electric Corporation of America (hereinafter "Panasonic") from October 17, 1974 through January 27, 1987. He is fifty-seven years old, and is Jewish. Plaintiff Norma Haigh, a Virginia citizen, is Haigh's wife.

Defendant Panasonic is a Delaware corporation. The individual defendants (hereinafter referred to by their last names), none of whom are Virginia citizens, are employees of Panasonic.

The Second Amended Complaint, which is currently before the Court, is sixty-eight pages long, and contains a plethora of allegations. In brief, Haigh states that he was a salesman for Panasonic who handled the accounts of Best Products and Circuit City. Haigh claims that during his tenure business with these two outfits skyrocketed. In December 1986, Haigh was told that the Best Products and Circuit City accounts were being taken away from him and given to defendant Weber. Haigh also claims he was told his salary would be cut, along with his earnable bonuses. Additionally, he was told that he would be reassigned from his Richmond, Virginia location to the Panasonic accounts in western Virginia. Haigh claims he argued that the reassignment was unlawful, and requested to be told the legitimate business reason for the action. In response, defendants Willner and Adamyk allegedly proposed that the Richmond accounts of Thalhimers, Miller & Rhoads, Robert's Leasing, and Dominion Pottery be added to Haigh's new territory. Haigh also asserts that these two defendants sought a complete release for all of Panasonic's actions to date.

In due course, by letter dated January 27, 1987, Haigh stated that his reassignment was unacceptable, and claimed that Panasonic had constructively terminated his employment. Since that time, Haigh claims to have vigorously sought employment without success.

Haigh's Second Amended Complaint contains sixteen counts.

Count One—Age Discrimination—Panasonic violated the Age Discrimination in Employment Act ("ADEA") by constructively terminating Haigh, age 56, and replacing him with Weber, age 35.

Count Two—Employee Retirement Income Security Act ("ERISA")—Panasonic's pension plan benefits are based on the highest compensation for any five consecutive years during the final ten years of employment. Haigh's proposed transfer was an attempt to unlawfully limit and reduce the amount of pension benefits which would be available to him.

Count Three—Defamation (Defendants Willner and Wolfe)—These defendants told two Best Products employees that Haigh was taken off the Best Products account because he was not doing his job, and because Best Products had requested the move. The statements were false, and Haigh was injured in his profession or trade as a result.

Count Four—Defamation (Defendant Kanow)—This defendant insinuated to several Panasonic employees that Luskin's (a potential employer) was not willing to consider employing Haigh. This statement was false and Haigh was injured in his profession or trade as a result.

Count Five—42 U.S.C. § 1985—Panasonic and some of the individual defendants have unlawfully conspired to deprive Haigh of his civil rights, in violation of 42 U.S.C. § 1985(3). Additionally, certain defendants conspired to coerce, intimidate, and influence three Panasonic employees in an attempt to deter truthful testimony in judicial proceedings, in violation of 42 U.S.C. § 1985(2).

Count Six—Antitrust—The adverse employment actions taken against Haigh were partly the result of his refusal to participate in Panasonic's illegal price-fixing schemes in 1985 and 1986.

Count Seven—Title VII—The adverse employment actions taken against Haigh were the result of discrimination based on religion (Jewish) and race (Jewish).

Count Eight—42 U.S.C. § 1981—The adverse employment actions taken against Haigh were the result of discrimination based on race (Jewish).

Count Nine—Breach of Contract—Panasonic breached the parties' verbal contract (to employ Haigh until he retired or for as long as he performed satisfactorily), and their written contract (as set out in anti-discrimination portion of Panasonic's employee handbook).

Count Ten—Interference with Contractual Rights—By slandering Haigh, conspiring to injure his business reputation, unlawfully demoting him, and constructively terminating his employment, the defendants tortiously interfered with Haigh's contractual rights concerning his employment.

Count Eleven—Negligent Representations—Representations contained in Panasonic's employee manual, defendant Willner's written and verbal representations, and defendant Hopkins' verbal representations constituted negligent representations designed to induce Haigh to start and continue working for Panasonic.

Count Twelve—Unjust Dismissal—Panasonic, by violating Title VII, 42 U.S.C. §§ 1981 and 1985, the ADEA and other statutes, and by constructively terminating him for his refusal to participate in a price-fixing scheme, has violated the public policy of Virginia in unjustly dismissing Haigh.

Count Thirteen—The defendants have intentionally inflicted emotional distress on Haigh and Norma Haigh.

Count Fourteen—Virginians With Disabilities Act—The adverse employment actions were taken against Haigh, a heart disease sufferer, partly because of his disability, and in contravention of the terms of the Virginians With Disabilities Act, Va. Code §§ 51.01–41 through 46.

Count Fifteen—Tortious Interference With Potential Employment—Defendants' actions concerning Haigh's potential employers were in contravention to the duties imposed on them under Va. Code § 40.1–27.

Count Sixteen—Attorneys' fees and costs.

Defendants deny liability on any and all counts, and, by motion and accompanying memorandum pursuant to Fed.R.Civ.P. 12(b)(1) and (6), seek dismissal of a number of Counts. Plaintiffs responded by way of memorandum, and defendants replied to that response. A hearing was held on the motion on September 22, 1987, at which time plaintiffs sought a delay in the Court's ruling to enable discovery to proceed so that certain issues could be more fully and accurately addressed. Subsequently, plaintiffs were permitted to file a Second Amended Complaint, after which

defendants were allowed to file a supplemental memorandum. That memorandum has now been filed, and the motion is ripe for decision. The issues presented by the motion are set out in the following section of this Memorandum and Order.

### ISSUES

Defendants present eleven issues in connection with their motion to dismiss.

Issue I—Does Count Four fail to state a cause of action for defamation against defendant Kanow?

Issue II—Does Count Five fail to state a claim under 42 U.S.C. § 1985(3) or § 1985(2)?

Issue III—Must Count Six be dismissed because (a) it fails to state a claim for an antitrust violation, and (b) Haigh lacks standing to bring this claim?

Issue IV—Must Count Seven be dismissed because this Court lacks subject-matter jurisdiction over the Title VII claim?

Issue V—Does Count Nine fail to state a cause of action for breach of contract?

Issue VI—Does Count Ten fail to state a claim for tortious interference with contractual rights?

Issue VII—Does Count Eleven fail to state a claim for fraudulent representations?

Issue VIII—Does Count Twelve fail to state a claim for unjust dismissal in violation of public policy?

Issue IX—Must Count Thirteen be dismissed because (1) this Court lacks subject-matter jurisdiction over Haigh's claim for emotional distress, and (2) Haigh and Norma Haigh have failed to state a cause of action for emotional distress?

Issue X—Does Count Fifteen fail to state a cause of action for tortious interference with potential employment?

Issue XI—Must Count Sixteen be dismissed because no cause of action exists for the recovery of attorneys' fees and costs?

### Discussion

*Issue I*

In Count Four, Haigh alleges that defendant Kanow defamed him at a Panasonic sales meeting. The allegation is spelled out in Paragraph 122 of the Second Amended Complaint:

On or about April 24, 1987, at Panasonic's national sales meeting in Las Vegas, Nevada, Kanow told a group of Panasonic employees that Haigh had applied for employment with Luskin[']s, Inc., but that "Luskin[']s would not give him the time of day." According to witnesses, the implication was that because of Haigh's poor job performance at Panasonic, he was not capable of managing the new Luskin[']s stores in Richmond. In fact, Haigh was clearly qualified and capable for the job since he had managed similar stores while he was employed by Ward's TV (predecessor of Circuit City), and had established a good reputation in the Richmond electronics market through his association with Best, Circuit City, Dominion Pottery, and other area wholesalers.

Haigh seeks to hold Kanow and Panasonic liable, claiming the statement to be defamation *per se.*

These defendants present a two-fold argument. First, they contend that the statement is one of opinion, not fact, and thus cannot form the basis of a defamation claim. Second, they argue that the statement does not constitute defamation *per se.*

Although the statement in question was uttered in Nevada, it has long been held that "words actionable at common law may be sued on in a common-law action in any jurisdiction where the defendant may be found." *Davis v. Heflin,* 130 Va. 169, 172, 107 S.E. 673, 674 (1921).

■ Turning first to the defamation *per se* issue, the common law prescribed four instances in which words are actionable *per se:*

(1) Those which impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be in-

dicted and punished. (2) Those which impute that a person is infected with some contagious disease, where if the charge is true, it would exclude the party from society. (3) Those which impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment. (4) Those which prejudice such person in his or her profession or trade.

*Carwile v. Richmond Newspapers,* 196 Va. 1, 7, 82 S.E.2d 588, 591 (1954).

Defamatory words not falling within these categories must, in order to be actionable, be supported by special damages. *Id.* Moreover, in a situation such as the instant one, "the words must contain an imputation that is 'necessarily hurtful' in its effect upon plaintiff's business and must affect him in his particular trade or occupation." *Fleming v. Moore,* 221 Va. 884, 889–90, 275 S.E.2d 632, 636 (1981), *cert. denied,* 472 U.S. 1032, 105 S.Ct. 3513, 87 L.Ed.2d 643 (1985).

The allegation taken as true, complete with all contextual inferences and imputations drawn in Haigh's favor, would prejudice Haigh in his profession. A gross misrepresentation of Haigh's job performance would be an obtrusive stumbling block to his gaining other employment.

■ Turning now to the opinion/fact dispute, it must first be noted that the court, and not the jury, must decide as a matter of law whether an allegedly defamatory statement is one of opinion or one of fact. *Chaves v. Johnson,* 230 Va. 112, 119, 335 S.E.2d 97, 102 (1985). Statements of opinion are absolutely protected under the first amendment. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339, 94 S.Ct. 2997, 3006, 41 L.Ed.2d 789 (1974).

Defendants argue that Kanow's alleged utterance, "Luskin[']s would not give him [Haigh] the time of day," must, in any plain and ordinary sense, be construed as an opinion. "[I]t is a general rule that allegedly defamatory words are to be taken in their plain and natural meaning and to be understood by courts and juries as other people would understand them, and accord-

ing to the sense in which they appear to have been used." *Carwile,* 196 Va. at 7, 82 S.E.2d at 591–92. However, a court must not view the statement in a vacuum; rather, fair inferences and innuendoes must be considered, not to enlarge the meaning of the words, but to explain their usage. *Id.* at 8, 82 S.E.2d at 592; *Guide Publishing Co. v. Futrell,* 175 Va. 77, 87–88, 7 S.E.2d 133, 138 (1940).

In recent years, several United States Courts of Appeals have wrestled with the fact/opinion dilemma, devising a test to be applied in consideration of such an issue. *Janklow v. Newsweek, Inc.,* 788 F.2d 1300 (8th Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986); *Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). The Fourth Circuit accepted and applied this test in *Potomac Valve & Fitting Inc. v. Crawford Fitting Co.,* 829 F.2d 1280, 1287–90 (4th Cir.1987). The test consists of four parts, which will be referred to as precision, verifiability, context, and setting. Under the precision prong, the inquiry becomes whether the words, taken in a common and ordinary way, are sufficiently precise, specific, and well-defined so as to be interpreted as statements of fact or ones containing clear factual implications. *Ollman,* 750 F.2d at 979–80. Vague and imprecise statements are difficult to categorize as fact. *Janklow,* 788 F.2d at 1302.

In accordance with the verifiability prong, the court must examine whether the statements are "objectively capable of proof or disproof." *Ollman,* 750 F.2d at 981. If the statements are not subject to verifiability, they cannot be looked upon as "fact." *Janklow,* 788 F.2d at 1302. However, if the statements are verifiable, they may still qualify as opinion "if it is clear from *any* of the three remaining *Ollman* fators, individually or in conjunction, that a reasonable reader or listener would recognize its weakly substantiated or subjective character—and discount it accordingly." *Potomac Valve & Fitting Inc.,* 829 F.2d at 1288.

The context prong involves a consideration of just that, the context in which the words are spoken, as opposed to a tunnelvision review of the bald statement itself. The whole, rather than a miniscule part, of the conversation, speech, or writing must be taken into account. *Ollman*, 750 F.2d at 982. In a similar vein, the setting or "social context" in which the words were spoken, must also be considered. "Some types of writing or speech by custom or convention signal to readers or listeners that what is being read or heard is likely to be opinion, not fact." *Id.* at 983 (footnote omitted).

Applying the test to the allegations now before the Court, attention is immediately drawn to the context and setting prongs of the equation. Haigh, taking the words allegedly uttered by Kanow, seeks to draw the inference that "Kanow knowingly and intentionally falsely intimated that Haigh was not qualified for or worthy of consideration for any job with Luskin[']s." Second Amended Complaint, at Paragraph 187. Haigh would have the Court believe that the presence of Panasonic employees at the Las Vegas meeting, and the discussion of Haigh's job performance and his potential employment with Luskin's provided the context and setting in which a listener would readily accept the representations as fact. This scenario is a conceivable one, and, as such, the motion to dismiss must be denied.

■ The issue now before the Court illustrates one important distinction between Rule 12(b)(6) motions to dismiss and motions for summary judgment: the latter can be decided with the benefit of some degree of factual development; the former must be decided mainly on plaintiff's legal theories. The essentially legal nature of Rule 12(b)(6) determinations is a function of the familiar federal principle of notice pleading, which "is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues." *Conley v. Gibson*, 355 U.S. 41, 47–48, 78 S.Ct. 99, 102–03, 2 L.Ed.2d 80 (1957).

It may very well come to pass that, through the use of affidavits and/or deposition testimony, defendants will provide undisputable evidence that Kanow's statement, if spoken at all, was readily meant and understood to be a statement of opinion. At this juncture, however, the Court cannot so hold.

*Issue II*

Count Five concerns both 42 U.S.C. § 1985(3) and § 1985(2). Defendants argue that the entire count must be dismissed for failure to state a claim under either section.

(a) 42 U.S.C. § 1985(3).

■ Haigh alleges that defendants Panasonic, Willner, Berman, Adamyk, Latini, Gold, Kellner, Weber, and Wolfe unlawfully conspired to deprive Haigh, and others similarly situated, of their civil rights. Haigh claims the alleged conspiracy resulted in discrimination against him on the basis of age, race and religion, and that the conspiracy constituted an unlawful attempt to prevent him from receiving his employee benefits under ERISA. He seeks compensatory and punitive damages. 42 U.S.C. § 1985(3) reads as follows:

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person

or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

The United States Supreme Court, in *Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971), has spelled out the requirements for a § 1985(3) action:

To come within the legislation a complaint must allege that the defendants did (1) "conspire or go in disguise on the highway or on the premises of another" (2) "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." It must then assert that one or more of the conspirators (3) did, or caused to be done, "any act in furtherance of the object of [the] conspiracy," whereby another was (4a) "injured in his person or property" or (4b) "deprived of having and exercising any right or privilege of a citizen of the United States."

Defendants argue that Haigh fails to state a claim under this statute because the conspiracy element of the equation has not been satisfied. Specifically, defendants contend that agents of a single corporation cannot form a conspiracy to terminate a person's employment within the meaning of § 1985(3). This position has occasionally been dubbed the "intracorporate exception" to the general rule concerning civil conspiracy, *see Stathos v. Bowden*, 728 F.2d 15, 20 (1st Cir.1984), but within this Circuit has been referred to as the "intracorporate conspiracy doctrine." *John C. Holland Enterprises, Inc. v. J.P. Mascaro & Sons, Inc.*, 653 F.Supp. 1242, 1248, (E.D. Va.1987).

There exists a split of authority on the question of the applicability of the intracorporate conspiracy doctrine to § 1985 actions. *See generally Walker v. Woodward Governor Co.*, 631 F.Supp. 91, 92–95 (N.D. Ill.1986). The Seventh Circuit established the framework of the debate in *Dombroski v. Dowling*, 459 F.2d 190, 196 (7th Cir. 1972):

We also believe that the statutory requirement that "two or more persons ... conspire or go in disguise on the highway," is not satisfied by proof that a discriminatory business decision reflects the collective judgment of two or more executives of the same firm. We do not suggest that an agent's action within the scope of his authority will always avoid a conspiracy finding. Agents of the Klan certainly could not carry out acts of violence with impunity simply because they were acting under orders from the Grand Dragon. But if the challenged conduct is essentially a single act of discrimination by a single business entity, the fact that two or more agents participated in the decision or in the act itself will normally not constitute the conspiracy contemplated by this statute.

The Second Circuit has adopted this reasoning. *Girard v. 94th Street and Fifth Avenue Corp.*, 530 F.2d 66, 70–72 (2d Cir.), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976).

Moreover, the *Dombroski* rationale has received some favorable reviews in our own Fourth Circuit. *See Bellamy v. Mason's Stores, Inc.*, 508 F.2d 504, 508 (4th Cir.1974) (Boreman, J., concurring); *Eggleston v. Prince Edward Volunteer Rescue Squad, Inc.*, 569 F.Supp. 1344, 1352 (E.D. Va.1983), *aff'd mem.*, 742 F.2d 1448 (4th Cir.1984) ("a § 1985 conspiracy cannot occur within a corporation or agency where the parties act in furtherance of their corporate responsibilities"); *Fowler v. Department of Education*, 472 F.Supp. 121, 122 (E.D.Va.1978).

On the other side of the debate are found the First, *Stathos*, 728 F.2d at 20–21, and Third Circuits, *Novotny v. Great Ameri-*

*can Federal Savings and Loan Association,* 584 F.2d 1235, 1257–59 (3d Cir.1978), *vacated and remanded on other grounds,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). The *Stathos* court articulated the rationale behind this position:

> We doubt that this "intracorporate" exception should be read broadly. The cases employing it have rested in large part on precedent drawn from the antitrust field, where considerations underlying the need for an "intracorporate" exception to ordinary conspiracy principles are very different. The evil at which the "conspiracy" section of the Sherman Act, 15 U.S.C. § 1, is aimed is an evil that exists only when two different business *enterprises join* to make a decision, such as fixing a price, that in a competitive world each would take separately. Moreover, an individual decision to do the same thing is not only legitimately socially useful but also may often require joint decisionmaking by managers within a single enterprise. Where "equal protection" is at issue, however, one cannot readily distinguish in terms of harm between the individual conduct of one enterprise and the joint conduct of several. Nor can one readily identify desirable social conduct as typically engaged in jointly by the officers of a single enterprise. Thus, the boundaries of an "intracorporate" exception to the § 1985(3) conspiracy provision should be narrower than in antitrust. Indeed, we do not see why they should extend—if at all—beyond the ministerial acts of several executives needed to carry out a single discretionary decision.

*Stathos,* 728 F.2d at 20–21 (citations omitted, emphasis in original).

Although it is sometimes difficult to discern the precise position of courts which have addressed the § 1985 intracorporate conspiracy doctrine, it is apparent that exceptions to the doctrine have been recognized. For example, the court in *Weaver v. Gross,* 605 F.Supp. 210, 215 (D.D.C.1985), held that an exception should apply for actions "taken solely for personal, nonbusiness motivations." Other courts have noted an exception "where individual de-

fendants are also named and those defendants act outside the scope of their employment for personal reasons." *Garza v. City of Omaha,* 814 F.2d 553, 556 (8th Cir.1987). Although couched in slightly different language, the *Weaver* and *Garza* analyses would most likely yield the same results.

Yet another exception has been promoted in the situation where employees of a single corporation allegedly commit a series of discriminatory acts rather than a single act of discrimination. *Craft v. Board of Trustees of University of Illinois,* 516 F.Supp. 1317, 1324 (N.D.Ill.1981), *aff'd,* 793 F.2d 140 (7th Cir.1986) (issue not addressed on appeal); *Rackin v. University of Pennsylvania,* 386 F.Supp. 992, 1005–06 (E.D. Pa.1974). This view has been criticized in *Coley v. M & M Mars, Inc.,* 461 F.Supp. 1073, 1076 (M.D.Ga.1978).

The Fourth Circuit has addressed, and seemingly resolved the question of what approach is to be followed by this Court. In *Buschi v. Kirven,* 775 F.2d 1240 (4th Cir.1985), plaintiffs charged the defendant state officials and employees with, *inter alia,* violations of 42 U.S.C. § 1983 and 42 U.S.C. § 1985(3). There, the court focused on the applicability of the doctrine in the context of civil rights law.

> Though the doctrine has been criticized, this intracorporate conspiracy doctrine was recognized and adopted by us in *Greenville Publishing Co., Inc. v. Daily Reflector, Inc.,* 496 F.2d 391, 399 (4th Cir.1974)[.]

> . . . . .

> This is not to say that there have not been exceptions to the doctrine in certain of the cases.... We applied such an exception in *Greenville Publishing,* where, after stating that "[w]e agree with the general rule" as stated in the intracorporate conspiracy doctrine in *Nelson Radio [ & Supply Co. v. Motorola, Inc.,* 200 F.2d 911 (5th Cir.1952), *cert. denied,* 345 U.S. 925 [73 S.Ct. 783, 97 L.Ed. 1356] (1953) ], we added that "an exception may be justified when the officer has an independent personal stake in

achieving the corporation's illegal objective." 496 F.2d at 399.

*Buschi,* 775 F.2d at 1252 (citations omitted). *See also Ridgeway Coal Co. v. FMC Corp.,* 616 F.Supp. 404, 408–09 (S.D.W.Va. 1985).

In the instant case, the allegation is that Panasonic and eight of its employees conspired to deprive Haigh of his civil rights. Obviously then, the doctrine is operative in the absence of the "personal stake" exception. On this point, Haigh has not alleged that any individual defendant has an interest in this controversy other than that which concerns his employment with Panasonic. Accordingly, the § 1985(3) claim will be dismissed.

(b) 42 U.S.C. § 1985(2).

 Haigh also alleges that defendants Panasonic, Willner, Wolfe, Kellner, and Adamyk have conspired to deter the truthful testimony of certain witnesses, and have also coerced Best Products employees to provoke commentary which reflects disfavorably on Haigh. Haigh claims damages for violation of 42 U.S.C. § 1985(2). This section reads as follows:

> If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;
>
> . . . . .
>
> [T]he party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

Haigh's claim must fall. As with the § 1985(3) analysis, the intracorporate conspiracy doctrine is applicable. *See Fowler,* 472 F.Supp. at 122.

Having so found, this Court need not address the question of Haigh's standing to bring a § 1985(2) claim based on allegations of pre-trial intimidation of others. For a discussion of this issue, see *Malley–Duff & Associates, Inc. v. Crown Life Insurance Co.,* 792 F.2d 341 (3d Cir.1986), *aff'd,* —— U.S. ——, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) (§ 1985(2) issue not addressed by Supreme Court); *Miller v. Glen & Helen Aircraft, Inc.,* 777 F.2d 496 (9th Cir.1985); *Chahal v. Paine Webber Inc.,* 725 F.2d 20 (2d Cir.1984); *Kimble v. D.J. McDuffy, Inc.,* 648 F.2d 340 (5th Cir.) (en banc), *cert. denied,* 454 U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981); *Burch v. Snider,* 461 F.Supp. 598 (D.Md.1978).

*Issue III*

In Count Six of the Second Amended Complaint Haigh alleges that adverse employment actions were taken against him by Panasonic, Willner, Berman, Adamyk, Kellner, and Wolfe because of his refusal to participate in and encourage alleged price-fixing schemes. Haigh seeks to hold these defendants liable under 15 U.S.C. § 15(a) and Va.Code § 59.1–9.12. Defendants move to dismiss, arguing that Haigh (a) has not suffered an antitrust injury, and (b) has no standing to sue.

Although the antitrust injury and standing arguments tend to merge, the analyses should remain distinct. *See, e.g., Local Beauty Supply, Inc. v. Lamaur, Inc.,* 787 F.2d 1197, 1201 (7th Cir.1986). Before proceeding to that analyses, however, the core precedential framework of the inquiries should be established.

In 1982, two Circuits, the Seventh and the Ninth, had occasion to consider the claims of employees who alleged that they were fired or forced to resign for refusal to participate in illegal price-fixing schemes. In *In Re Industrial Gas Antitrust Litigation (Bichan v. Chemetron Corp.),* 681 F.2d 514 (7th Cir.1982), *cert. denied,* 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983), the court held that plaintiff had not sustained an antitrust injury and had no standing to bring the action. In contrast, the Ninth Circuit, by split decision, in *Ostrofe v. H.S. Crocker Co.,* 670 F.2d 1378 (9th Cir.1982) *["Ostrofe I"], vacated and remanded,* 460 U.S. 1007, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983), *on remand,* 740 F.2d 739 (9th Cir.1984) *["Ostrofe II"], cert. dismissed,* 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985), reached the exact opposite conclusions. The unsuccessful litigants in both cases sought review by the Supreme Court. Meanwhile, that Court handed down its decision in *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). There, the Court attempted to clarify the question of who may sue under Section 4 of the Clayton Act, 15 U.S.C. § 15.

Thereafter, the Court denied certiorari in *Bichan,* 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983), while vacating and remanding *Ostrofe I,* 460 U.S. 1007, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983), for reconsideration in light of the opinion in *Associated General Contractors.* Upon remand, the Ninth Circuit, again with Judge Kennedy dissenting, continued to follow its earlier holding. *Ostrofe II,* 740 F.2d 739 (9th Cir. 1984).

(a) Antitrust Injury

■ In *Brunswick v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697–98, 50 L.Ed.2d 701 (1977), the Supreme Court held that in order to maintain an antitrust action, plaintiffs

> must prove more than injury casually linked to an illegal presence in the market. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause." *Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. [100], at 125 [89 S.Ct. 1562, at 1577, 23 L.Ed.2d 129 (1969) ].

(Emphasis in original, footnote omitted.)

The courts in *Ostrofe I* and *Bichan* drew on this language from *Brunswick* in reaching their conclusions. For example, the Ninth Circuit wrote: "The central theme of *Brunswick* is that to be actionable under Section 4 [of the Clayton Act], plaintiff's injury should fall within the core of Congressional concern underlying the substantive provision of the antitrust laws allegedly violated." *Ostrofe I,* 670 F.2d at 1387. The court went on to hold that plaintiff's loss was related to antitrust laws, therefore, it concluded that plaintiff had sustained an antitrust injury. *Id.* at 1387–88.

*Bichan* was critical of the Ninth Circuit's interpretation of the language in *Brunswick:*

> We reject the *Crocker [Ostrofe I]* holding. We believe Judge Kennedy's dissent, maintaining that, under sound antitrust principles, a marketing director whose injury has nothing to do with the alleged anticompetitive conduct of price fixing has not sustained an "antitrust injury," is the more reasoned analysis, and we adopt it here.

> We disagree with the majority analysis in *Crocker* for several reasons. First, we read *Brunswick* to hold that § 4 protects only those persons injured as consumers or competitors in a defined market or in a discrete area of the economy. Second, reading *Brunswick* in conjunction with *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707, *rehearing denied,* 434 U.S. 881, 98 S.Ct. 243, 54 L.Ed.2d 164 (1977), we are convinced that in fashioning the antitrust laws Congress was concerned with com-

petition, not employee coercion or discharge. Thus, a mere relationship with the anticompetitive scheme is insufficient to bring the injured party within the scope of § 4; only where the injury is directly related to the scheme's anticompetitive effect does § 4 apply.

We decline to usurp the legislative role and rewrite the treble damages provision to extend antitrust protection beyond that dictated by established precedent and Congressional intent.

*Bichan,* 681 F.2d at 519.

The *Ostrofe II* court clung to its original holding, ruling that plaintiff's injury was such an "integral part" of the illegal scheme that it qualified as an antitrust injury. *Ostrofe II,* 740 F.2d at 746. The Third Circuit has subsequently rejected this analysis. *Gregory Marketing Corp. v. Wakefern Food Corp.,* 787 F.2d 92, 96 (3d Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 87, 93 L.Ed.2d 40 (1986).

This court also rejects the *Ostrofe* analysis. The language of *Brunswick,* as analyzed and amplified by *Bichan,* leads to the unmistakable conclusion that Haigh's injuries are not antitrust injuries. The *Brunswick* Court wrote that the injury should be "the type of loss that the claimed violations ... would be likely to cause." *Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697–98 (quoting *Zenith Radio Corp.,* 395 U.S. at 125, 89 S.Ct. at 1577).

In this case, the "claimed violations" consist of illegal price-fixing schemes. The "type of loss" likely to be caused by such schemes is sustained by competitors or consumers. Haigh's transfer and "constructive termination" do not meet "these criteria."

(b) Standing

Assuming *arguendo* that Haigh has suffered an antitrust injury, his standing to maintain an antitrust action is suspect.

Any standing analysis must, as the commentary below explains, separate illegal boycotts or restraints against employees from indirect consequential injuries to employees.

Cases involving the direct application of illegal restraints against one or more employees do not involve a complicated standing analysis. When a party intentionally engages in anticompetitive activity against specific parties, the victims have standing to sue the violator. The requirements of antitrust injury clearly are satisfied, giving the victims standing to bring treble damage actions. If an employee is not the object of the anticompetitive conduct, however, the situation is different. Without an independent illegal restraint of trade to create grounds for standing, the policies underlying antitrust laws come into play, and courts must consider the remoteness and antitrust nature of the injury in deciding whether the employee has standing to sue under the antitrust laws.

Note, *Standing of the Terminated Employee Under Section 4 of the Clayton Act,* 25 Wm. & Mary L.Rev. 341, 355–56 (1983).

As noted, the *Ostrofe I* and *Bichan* courts also split on this question. *Ostrofe I,* in holding that the plaintiff had standing, focused on the purposes of Section 4 (promote competition, etc.) and found that the plaintiff was in a unique position to promote those purposes by refusing to participate in the price-fixing scheme. As such, any injury that resulted from his promotion of those purposes should entitle him to bring suit. *Ostrofe I,* 670 F.2d at 1383–84. *Bichan,* on the other hand, found that the plaintiff's injury was too "indirect" to confer standing upon him. *Bichan,* 681 F.2d at 520.

The Supreme Court considered the antitrust standing issue in *Associated General Contractors.* There, a labor union was denied standing to bring a claim alleging a conspiracy among contractors and landowners to divert business to non-union groups. The Court, in refusing to grant standing, held, *inter alia,* that the alleged injury was not "the type that the antitrust statute was intended to forestall," and that the union's alleged injuries were too indirectly related to the conduct in question to confer standing. *Associated General Contractors,* 459 U.S. at 540, 103 S.Ct. at 909.

Despite this holding the Ninth Circuit, on remand of *Ostrofe,* stated: "[W]e believe nonetheless that allowing Ostrofe standing would be a sound interpretation of Section 4." *Ostrofe II,* 740 F.2d at 746. This view has received support, *Donahue v. Pendleton Woolen Mills, Inc.,* 633 F.Supp. 1423, 1437–39 (S.D.N.Y.1986), and criticism, *Winther v. DEC International, Inc.,* 625 F.Supp. 100, 102–03 (D.Colo.1985).

Again, this Court must reject the *Ostrofe* analysis. As with the antitrust injury examination, the issues of purpose and directness are key considerations. *Associated General Contractors,* 459 U.S. at 540, 103 S.Ct. at 909. Allowing Haigh to maintain this action would not promote the essential purposes of Section 4 of the Clayton Act. Moreover, the alleged illegal activity was not designed to injure Haigh, but any injury to him came about merely as an indirect consequence to fulfillment of the plan.

Furthermore, there exist two other legitimate reasons for denying standing to Haigh. First, as noted earlier, the Supreme Court, in the wake of *Associated General Contractors,* denied certiorari in *Bichan,* yet vacated and remanded *Ostrofe I* for reconsideration. Judge Kennedy, in his *Ostrofe II* dissent, was struck by these actions.

> [B]y reaffirming *Ostrofe I,* the majority creates a conflict with the Seventh Circuit in *Bichan v. Chemetron Corp.,* 681 F.2d 514 (7th Cir.1982), *cert. denied,* 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983). To say, as the majority does, that the Supreme Court does not worry about circuit conflict when it comes to antitrust standing, *see* Majority Opinion at 747–748, is a strange way to interpret the Supreme Court's order vacating the majority's first opinion.

> *Bichan* was an explicit consideration and rejection of the majority's opinion in *Ostrofe I,* and the Supreme Court chose to deny certiorari in *Bichan* on the same day *Ostrofe I* was vacated. It is inappropriate for us to speculate on the reasons for declining the issuance of certiorari. But in answer to the majority, I think it appropriate to say that I doubt the Su-

preme Court values our reconsideration more than that of the Seventh Circuit, and it is patronizing for the majority to imply otherwise.

*Ostrofe II,* 740 F.2d at 751 (Kennedy, J., dissenting).

Finally, the Ninth Circuit itself appears to have, through subsequent explanation, lessened the import of the *Ostrofe* holdings. In *Exhibitors' Service, Inc. v. American Multi–Cinema, Inc.,* 788 F.2d 574, 580 (9th Cir.1986), the court, in distinguishing *Ostrofe II,* focused on Ostrofe's presence as an "essential participant" in the price-fixing scheme, which could not succeed "without his active participation." (Quoting *Ostrofe II,* 740 F.2d at 745–46). In the instant case, there is no allegation that Haigh was an "essential participant" in the scheme alleged in this case. As such, it is doubtful that even *Ostrofe II* would foreclose the dismissal of this Count.

*Issue IV*

■ Defendants, in initially presenting their motion to dismiss, argued that Count Seven (Title VII claim) should be dismissed on jurisdictional grounds. Haigh filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") on March 12, 1987. He filed the original Complaint in this Court on June 30, 1987, 110 days after the EEOC filing. 42 U.S.C. § 2000e–5(f)(1) permits a private right of action if a charge filed with the EEOC is dismissed or if the EEOC has not commenced a civil action within 180 days from the filing. Haigh did not wait the requisite 180 days before filing his original Complaint.

The issue, however, is now moot. Haigh's Second Amended Complaint was filed on October 21, 1987. Haigh received his "Notice of Right to Sue" from the EEOC on September 10, 1987. Second Amended Complaint, Paragraph 145. Any jurisdictional defect has now been cured.

*Issue V*

■ Count Nine alleges that "Panasonic breached its verbal contract to employ Haigh until he retired (*i.e.,* for twenty-one years) and its written contract (as set out in ... the employee manuals it issued to

Haigh) not to unlawfully discriminate against its employees." Second Amended Complaint, Paragraph 200.

In its motion, Panasonic challenges the enforceability of the alleged verbal contract. The alleged written contract, based on Panasonic's employee manuals, is not, for good reason, under challenge at this time. *Thompson v. Kings Entertainment Co.*, 653 F.Supp. 871, 874 (E.D.Va.1987) ("terms and policies contained in an employee handbook can become part of a binding contract"). Panasonic's contention is that an oral contract is unenforceable under the statute of frauds. Va.Code § 11–2(7) (oral contract not to be performed within one year cannot form the basis of an action).

Haigh's Second Amended Complaint alleges that he and Panasonic had an oral contract for his employment until retirement. The Complaint itself defines "until retirement" as twenty-one years. Having put this qualifier on the term "until retirement," Haigh cannot now argue that the contract was capable of performance within a year. If this were the sole basis of the alleged oral contract, Haigh's claim would surely be unenforceable under the statute of frauds.

However, Count Nine realleges and incorporates by reference prior paragraphs of the Complaint. The Court's attention is specifically drawn to Paragraphs 24 and 27. Paragraph 24 alleges that defendant Willner (Panasonic's Vice President and General Manager of its Mid–Atlantic Group), told Haigh that he would have a job and financial security as long as he performed satisfactorily. Paragraph 27 alleges that Willner told Haigh, "If you keep up the good work, they can't get rid of you."

In essence then, Haigh alleges that his original oral contract (for twenty-one years) was modified by Willner's statements concerning job performance. As such, a good cause or just cause aspect can be inferred as a part of Haigh's employment situation. While the more artful form of pleading would have included these just cause allegations within the Count

Nine paragraphs, they cannot be disregarded by the Court.

Judge MacKenzie of this Court has found that a just cause provision is properly considered in reviewing oral employment agreements. In *Frazier v. Colonial Williamsburg Foundation*, 574 F.Supp. 318, 320 (E.D.Va.1983), the judge wrote:

In Virginia, an employment relationship is presumptively "at will" where no specific time limit is set on the length of employment. This presumption is rebutted when the employer promises that the relationship will end only for a good cause and the employee relies upon that promise. The promise then becomes enforceable and the employment relationship is no longer "at will". *Norfolk Southern Railway Co. v. Harris*, 190 Va. 966, 59 S.E.2d 110 (1950). While the promise was embodied in a written contract in *Norfolk Southern*, the same general principle applies here.

. . . . .

Contrary to the defendant's suggestion, the Statute of Frauds, Va.Code § 11–2(7) (1978), is not triggered here. A writing is not needed so long as the contract can be performed within a year, even if only by some improbable event. *Silverman v. Bernot*, 218 Va. 650, 239 S.E.2d 118 (1977). The contract which Frazier alleges could be performed within one year since, for example, Frazier could have been discharged for good cause within a year of having been hired. *Frazier*, 574 F.Supp. at 320.

In *Silverman*, the court found that the parties expected the employment contract would be performed if plaintiff worked for defendant until the age of sixty-two (more than one year), or until defendant's death, whichever came first. The court held that since performance of the contract, through the death of the defendant, could have taken place within one year, then the contract did not fall within the statute of frauds. It mattered not that the occurrence of the triggering event was improbable, only that it was reasonable and possible. *Silverman*, 218 Va. 650, 655, 239 S.E.2d 118, 121 (1977).

Judge MacKenzie, using *Norfolk Southern* as authority, applied the *Silverman* analysis to the just cause situation. However, a recent commentary criticized *Frazier*, arguing that *Norfolk Southern* was misapplied. Marshall & Wicker, *The Status of the At–Will Employment Doctrine in Virginia After Bowman v. State Bank of Keysville*, 20 U.Rich.L.Rev. 267, 285–86 (1986). *Norfolk Southern* involved a written collective bargaining agreement under which the railroad agreed not to discipline or dismiss its engineers "without a just cause." *Norfolk Southern*, 190 Va. at 976, 59 S.E.2d at 111. The case involved the employment-at-will doctrine, not the statute of frauds. The commentators have written:

> [I]n *Frazier v. Colonial Williamsburg Foundation*, the federal court erroneously applied *Norfolk Southern Railway Co. v. Harris* and implied a "just cause for termination" provision even though there was no written contract (such as the collective bargaining agreement relied on in *Norfolk Southern* ).
>
> . . . . .
>
> [T]he court misinterpreted Virginia's law concerning the Statute of Frauds. In *Silverman v. Bernot*, the Virginia Supreme Court distinguished between *termination by operation of law* and *completion by performance*. The *Frazier* court did not. In *Frazier*, the court ruled that the Statute of Frauds did not bar enforcement of an alleged oral agreement to dismiss the plaintiff only for just cause. In stating that the oral contract could have been performed within one year because the plaintiff could have been discharged for good cause within his first year of employment, the court in *Frazier* failed to recognize the distinction between full performance and excusing performance. Had the plaintiff in *Frazier* been discharged for cause within his first year of employment, neither party would have fully "performed." Rather, the plaintiff simply would have breached his promise to render satisfactory service, and his breach would have excused the employer from further performance. Because full performance

within a year was not possible under the alleged oral agreement, the *Frazier* court should have held any "contract" unenforceable. Thus, *Frazier* misapplied Virginia law and should not be used as authority for creating a just cause standard absent a written contract.

Marshall & Wicker, *supra*, at 285–86 (footnotes omitted).

Members of this Court are generally reluctant to reject precedent from another judge of this district. *See Hewitt v. Firestone Tire & Rubber Co.*, 490 F.Supp. 1358, 1364 n. 12 (E.D.Va.1980). However, this Court has concluded that the commentators' analysis is an appropriate one, and that *Frazier* wrongly decided this point of law. This conclusion is most straightforwardly supported by the following language:

> A specification of a definite period of performance of a contract of employment which is for a year or longer, although qualified by making its continuance depend upon the character of the work, establishes that performance under the contract, as respects the one-year provision of the statute of frauds, is for a longer period than one year, prior termination being a breach, which may not be assigned as a reason for construing it as not within the statute. Thus, a contract for the employment of the plaintiff for "three (3) years from the date hereof, or for so much of such three (3) years as your results show the ability that you now claim to be able to give me," was held to be within the statute of frauds in *Wagniere v. Dunnell* (1909) 29 RI 580, 73 A 309, 17 Ann Cas 205, inasmuch as it could be terminated by one party only upon breach by the other, and in the event of such a termination there would not be a performance of the contract.

Annot., 28 A.L.R.2d 878, 880 (1953). *See also id.* (cases supporting).

It is incumbent upon the Court to emphasize that this ruling in no way impairs the viability of a "just cause" provision in a written employment contract.

*Issue VI*

██ Count Ten alleges the following: "By slandering Haigh, conspiring to injure his business reputation, unlawfully demoting, and constructively terminating his employment, Panasonic, Willner, Berman, Adamyk, Kanow, Latini, Gold, Kellner, Weber, and Wolfe tortiously interfered with Haigh's contractual rights concerning his employment." Second Amendment Complaint, Paragraph 202. This allegation fails to state a claim upon which relief can be granted.

In *Chaves v. Johnson*, 230 Va. 112, 335 S.E.2d 97 (1985), the Virginia Supreme Court detailed the requisite elements of a tortious interference with contractual rights claim. The elements include (1) the existence of a valid business relationship or expectancy, (2) knowledge of that relationship or expectancy on the part of the interferor, (3) intentional interference with the relationship or expectancy, causing or inducing a breakdown of the relationship or expectancy, and (4) injury. *Id.* at 120, 335 S.E.2d at 102. The interferor cannot be a party to the contract or business relationship, but must occupy the position of a third party. *Id.* (citing Restatement (Second) of Torts § 766 (1977)).

Here, it is abundantly clear that Haigh cannot maintain this action against Panasonic because his contention is that he had an employment contract with Panasonic. Panasonic, as the employer, cannot be guilty of tortiously interfering with an employment contract to which it was a party. *See Welch v. Kennedy Piggly Wiggly Stores, Inc.*, 63 B.R. 888, 894 (W.D.Va. 1986).

Nonetheless, Haigh argues that the individual defendants are liable for this tort because, although employees of Panasonic, they acted outside the scope of their employment. Courts have held that an employee can be held liable in such a situation if he does not act in the interests of his employer. *See, e.g., Stewart v. Ost*, 142 Ill.App.3d 373, 375–76, 96 Ill.Dec. 846, 848, 491 N.E.2d 1306, 1308 (1986).

On the other hand, if the employee acts within the scope of his duties and in furtherance of the employer's wishes, the employee is deemed to be, in effect, an extension of the employer, and cannot be labeled as an interferor or third party. *See Wells v. Thomas*, 569 F.Supp. 426, 435 (E.D.Pa. 1983); *Murray v. Bridgeport Hospital*, 40 Conn.Sup. 56, 60, 480 A.2d 610, 613 (1984). Moreover, so long as the employee is acting in furtherance of his employer's business, he does not step outside the scope of his employment, even if his actions be ill-advised. *Tri–State Coach Corp. v. Walsh*, 188 Va. 299, 307, 49 S.E.2d 363, 367 (1948).

In the instant case, the essence of Haigh's allegations, and the central theme of the entire Complaint, is that officials of Panasonic, for a variety of reasons, set into motion a scheme to get rid of Haigh. The actions of "slandering Haigh, conspiring to injure his business reputation, unlawfully demoting, and constructively terminating his employment," Second Amended Complaint, Paragraph 202, were allegedly carried out by the individual defendants to further Panasonic's scheme to get rid of him. Although the scheme may have been illegal, it was nonetheless, according to Haigh, devised by Panasonic officials to further Panasonic's interests (e.g., younger sales personnel, reduced liability for pension benefits). Having so alleged throughout his Complaint, Haigh cannot now assert, in response to the defendants' motion, that the individual defendants were operating outside the scope of their employment. The individual defendants shall also be dismissed.

*Issue VII*

██ In Count Eleven of the Second Amended Complaint, Haigh alleges that "Panasonic's employee manuals, Willner's written and verbal representations, and Hopkins' verbal representations concerning Haigh's employee status constituted negligent representations clearly designed to induce Haigh to start and continue working for Panasonic." Second Amended Complaint, Paragraph 204.

Haigh concedes that the Virginia Supreme Court has not recognized the tort of negligent misrepresentation, yet argues that this Court should do so, adopting the

reasoning of the court in *D'Ulisse–Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206, 520 A.2d 217 (1987). In so urging, Haigh contends that this Court must predict whether the Virginia Supreme Court would recognize the tort of negligent misrepresentation.

In support of this statement, Haigh cites to the following cases: *Morrissey v. William Morrow & Co.*, 739 F.2d 962 (4th Cir.1984), *cert. denied*, 469 U.S. 1216, 105 S.Ct. 1194, 84 L.Ed.2d 340 (1985); *Nature Conservancy v. Machipongo Club, Inc.*, 579 F.2d 873 (4th Cir.) (per curiam), *cert. denied*, 439 U.S. 1047, 99 S.Ct. 724, 58 L.Ed.2d 706 (1978); *Walker v. Winchester Memorial Hospital*, 585 F.Supp. 1328 (W.D.Va.1984); *White v. American Motor Sales Corp.*, 550 F.Supp. 1287 (W.D.Va. 1982), *aff'd*, 714 F.2d 135 (4th Cir.1983). In *Morrissey*, 739 F.2d at 967, and *White*, 550 F.Supp. at 1289, the courts were forced to choose between different views of the law on points which had not been addressed by the Virginia Supreme Court. In *Nature Conservancy*, 579 F.2d at 875, the court was faced with the problem of construing various Virginia statutes which had not been definitively interpreted by the Virginia Supreme Court, and resolved the issue by abstaining until a decision in a similar case was decided by that court. And in *Walker*, 585 F.Supp. at 1331, the court simply followed the Virginia Supreme Court's lead on a similar, but not identical, point of agency law.

This Court perceives a fundamental difference between the tasks required by the tribunals in the four abovementioned cases, and the invitation now put to this Court. Haigh asks this Court not to interpret statutes or choose between rules of law when the Virginia Supreme Court has not spoken. Instead, Haigh would have this Court create a new tort for the Commonwealth, i.e., make law. The Court, in declining the invitation, is mindful of the words of Judge Warriner:

> Plaintiff forgets that this Court is not only not the General Assembly of Virginia, the policy-making body of the Commonwealth, this Court is not even a common law court of the Commonwealth of Virginia. Whatever may be the proper role of appellate courts in making policy decisions on the basis of what they consider best for the people, I conceive the trial judge to be too busy, and properly so, trying lawsuits to permit myself the luxury, or arrogance, of gazing off into the mists to determine what social, legal, political, and moral strictures should be imposed upon the citizenry. As long as representative government exists, there is no excuse for a court arrogating to itself the authority to move the law along some purportedly wise or socially desirable path.

*Gravins v. International Playtex, Inc.*, 586 F.Supp. 251, 252 (E.D.Va.1984).

*Issue VIII*

Count Twelve alleges that Panasonic unjustly dismissed Haigh in violation of public policy. The Second Amended Complaint reads, in pertinent part, as follows:

> [B]y unjustly terminating Haigh's employment in violation of 42 U.S.C., Sections 1981 and 1985, Title VII of the Civil Rights Act of 1964 (42 U.S.C., Sections 2000e *et seq.*), the Age Discrimination in Employment Act (29 U.S.C., Sections 621 *et seq.*)[,] the Employee Retirement Income Security Act (29 U.S.C., Sections 1140 and 1141), the Virginians With Disabilities Act (Virginia Code, Section 51.01– 41 *et seq.*), and in retaliation of Haigh's refusal to participate in its unlawful price fixing activities (15 U.S.C., Section 1, *et seq.* and Virginia Code, Section 59.1– 9.5), Panasonic violated the public policy of the Commonwealth of Virginia.

Second Amended Complaint, Paragraph 206.

Panasonic moves to dismiss on the grounds that (a) Haigh is preempted from alleging certain statutes as a basis for an unjust dismissal claim, and (b) Haigh does not allege a recognized public policy exception to the employment-at-will rule. The Court shall first address the latter point.

In *Bowman v. State Bank of Keysville*, 229 Va. 534, 331 S.E.2d 797 (1985), the Virginia Supreme Court recog-

nized an exception to the employment-at-will doctrine. There, the Court held that the employer was liable for the termination of two employees who also owned stock in the employer corporation. The employees were terminated for failure to vote their stock in accordance with the dictates of management. The court held that the terminations violated public policy in that Va. Code § 13.1–32 guarantees a stockholder the right to cast one vote for each share of stock held, without fear of intimidation. "Because the right conferred by statute is in furtherance of established public policy, the employer may not lawfully use the threat of discharge of an at-will employee as a device to control the otherwise unfettered discretion of a shareholder to vote freely his or her stock in the corporation." *Bowman*, 229 Va. at 540, 331 S.E.2d at 801.

*Bowman* was recently discussed in *Miller v. SEVAMP, Inc.*, 234 Va. 462, 362 S.E.2d 915 (1987). There, the plaintiff alleged that her termination was in retaliation for exercising the rights given her in the employee handbook, i.e., to file grievances and testify freely before a grievance panel. The court distinguished *Miller* from *Bowman* in that *Miller* did not involve public policy established by existing laws, but instead concerned only private rights mandated by the employer's regulations. The court refused to recognize exceptions to the employment-at-will doctrine that do not concern public policy. *Miller*, 234 Va. at 467–69, 362 S.E.2d at 918–19.

Instructive for our purpose, however, is the court's discussion of public policy.

> *Bowman* applied a "narrow exception to the employment-at-will rule," *id.*, but it fell far short of recognizing a generalized cause of action for the tort of "retaliatory discharge." Declining to follow sweeping adoption of such a cause of action in other jurisdictions, *Bowman* recognized an exception to the employment-at-will doctrine limited to discharges which violate *public* policy, that is, the policy underlying existing laws designed to protect the property rights, personal freedoms, health, safety, or welfare of the people in general. Each of the illustrative cases from other jurisdic-

tions cited in *Bowman* involved violations of public policies of that character. 229 Va. at 539–40, 331 S.E.2d at 801. *Miller*, 234 Va. at 467–68, 362 S.E.2d at 918 (emphasis in original).

The "illustrative cases" cited in *Bowman* are as follows:

> *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385 (1980) (at-will employee fired in retaliation for his insistence that his employer comply with state laws relating to food labelling); *Nees v. Hocks*, 272 Or. 210, 536 P.2d 512 (1979) (employee fired for refusing employer's request to ask for excuse from jury duty); *Sabine Pilot Service, Inc. v. Hauck*, 687 S.W.2d 733 (Tex.1985) (employee discharged for refusal to perform an illegal act); *Harless v. First National Bank in Fairmont*, 162 W.Va. 116, 246 S.E.2d 270 (1978) (bank employee discharged in retaliation for his efforts to require employer to comply with state and federal consumer credit protection laws).

*Bowman*, 229 Va. at 539–40, 331 S.E.2d at 801.

It seems clear that *Bowman*, upon amplification by *Miller*, established a narrow public policy exception to the employment-at-will doctrine. That exception is, in this Court's estimation, triggered only when the discharge is in response to the employee's refusal to commit an unlawful act or in the employee's exercise of a statutory right. *See* Marshall & Wicker, *The Status of the At-Will Employment Doctrine in Virginia After Bowman v. State Bank of Keysville*, 20 U.Rich.L.Rev. 267, 272 (1986).

Framed in this context, the Court turns to the allegations contained in Count Twelve. Clearly, Haigh's allegations concerning 42 U.S.C. §§ 1981 and 1985, Title VII, the ADEA, ERISA, and the Virginians with Disabilities Act do not fall within the language noted above. Haigh claims that Panasonic, in violating these statutes, was guilty of unjust dismissal in violation of established public policy. This argument fails, in relation to these statutes, because no allegation is made that the discharge

was in response to Haigh's refusal to commit an unlawful act or his exercise of a statutory right.

■ However, Count Twelve is not totally defective. Haigh also alleges that he falls within the *Bowman* exception because he was discharged for his refusal to participate in an alleged illegal price-fixing scheme. Taking the allegation as true, Haigh's termination would be in violation of established public policy as expressed in 15 U.S.C. § 1 *et seq.* and Va.Code § 59.1–9.5. Specifically, the *Bowman* exception applies because Haigh alleges he was discharged for his refusal to commit an illegal act. This holding does not expand the rulings of *Bowman* and *Miller*, but conforms to those decisions in adhering to the rule of law established therein.

■ The Court now need only determine whether Haigh is preempted from pursuing such a claim. Clearly he is not. *See Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167, 610 P.2d 1330, 164 Cal.Rptr. 839 (1980) (employee allowed to bring claim alleging wrongful discharge for his refusal to participate in an illegal price-fixing scheme); Note, *Standing of the Terminated Employee Under Section 4 of the Clayton Act*, 25 Wm. & Mary L.Rev. 341, 369–71 (1983) (citing cases which support the use of wrongful discharge actions as a remedy for an employee's termination for refusal to fix prices).

*Issue IX*

In Count Thirteen, Haigh alleges that the defendants, by intentionally violating Haigh's rights under the ADEA, ERISA, Title VII, 42 U.S.C. §§ 1981 and 1985, and Va.Code § 18.2–499, and by blacklisting and slandering him, have subjected him to humiliation, embarrassment, mental anguish, and severe emotional distress. Moreover, Norma Haigh alleges that the defendants knew or should have known the effect their actions would have on her, and thus are also guilty of intentionally inflicting emotional distress on her and are responsible for her loss of consortium. Second Amended Complaint, Paragraph 208.

Defendants raise four issues on their behalf: (a) the Virginia Workers' Compensation Act precludes Haigh from recovering for emotional distress; (b) Haigh fails to state a claim for emotional distress; (c) Norma Haigh fails to state a claim for emotional distress; and (d) no claim for emotional distress has been stated against the individual defendants. These four points will be addressed in turn.

(a) The Virginia Workers' Compensation Act

■ Defendants argue that the Virginia Workers' Compensation Act, Va.Code §§ 65.1–1 *et seq.*, precludes Haigh from recovering for his alleged emotional distress in this forum. Amazingly enough, there are no reported cases which address this issue under Virginia law. The starting point of the analysis for this Court is, most appropriately, pertinent Code sections. The exclusivity provision in the Code is as follows:

§ 65.1–40. Employee's rights under Act exclude all others.—The rights and remedies herein granted to an employee when he and his employer have accepted the provisions of this Act respectively to pay and accept compensation on account of personal injury or death by accident shall exclude all other rights and remedies of such employee, his personal representative, parents, dependents or next of kin, at common law or otherwise, on account of such injury, loss of service or death.

The "personal injury" referred to above is defined in the following Code section:

§ 65.1–7. "Injury" defined.—Unless the context otherwise requires, "injury" and "personal injury" mean only injury by accident, or occupational disease as hereinafter defined, arising out of and in the course of the employment and do not include a disease in any form, except when it results naturally and unavoidably from either of the foregoing causes.

To further establish a framework for analysis, the term "accident" must be defined.

The definition of accident used by the Virginia Supreme Court was first

adopted in *Big Jack Overall Co. v. Bray*, 161 Va. 446, 171 S.E. 686 (1933), quoting the treatise, *Vance on Insurance*. The language has been quoted as follows: "The definition of accident generally assented to is an event happening without any human agency, or, if happening through human agency, an event which, under the circumstances, is unusual and not expected by the person to whom it happens." *Vance on Insurance* 569.

Two concepts are generally recognized and discussed when interpreting the "by accident" concept in Virginia. These concepts are a required degree of "unexpectedness" in the accident or injury, and a requirement of time specificity as to the occurrence of the accident or incident giving rise to the injury. The terms "accident" and "injury" are not synonymous. The term "accident" refers to the incident or precipitating event (the cause) that occurred at work which resulted in an "injury" (the effect).

L. Pascal, *Virginia Workers' Compensation: Law and Practice* 27–28 (1986).

Applying the Pascal language to the instant situation, a cursory analysis would indicate that the accident, incident, precipating event, or cause was or were the violation of rights alleged above as manifested in Haigh's transfer and subsequent "constructive termination." The injury or effect is emotional distress. The event occurred through human agency (i.e., the defendants), and, in this Court's estimation, was unusual and not expected by the person to whom it happened (i.e., Haigh). Moreover, the injury arose out of and in the course of the employment. An injury arises out of the employment when the injury can be fairly traced to the employment as at least a contributing cause. *Conner v. Bragg*, 203 Va. 204, 208–09, 123 S.E.2d 393, 396–97 (1962). An accident occurs in the course of the employment when it takes place within the period of employment, at a place where the employee may reasonably be, and while he is reasonably fulfilling his duties of employment. *Id.* at 208, 123 S.E.2d at 396. Thus, in this situation, all the statutory provisions have been met so as to trigger the exclusivity provision of Va.Code § 65.1–40.

The inquiry should not end here, however. A number of courts hold that claims for mental distress come under the Workers' Compensation Act only where the mental injury is connected to some physical harm. In other words, a claim for emotional distress, standing alone, can proceed in an action at law. *See* 2A A. Larson, *Workmen's Compensation Law* § 68.34(a) (1987). Virginia has not adopted this view. Indeed, the Virginia Supreme Court long ago explicitly held that recovery under the Workers' Compensation Act may be had as a result of mental ailments unaccompanied by physical injury. *Burlington Mills Corp. v. Hagood*, 177 Va. 204, 13 S.E.2d 291 (1941).

Yet another point must be addressed. Many states have recognized an intentional tort exception to workers' compensation exclusivity rules. Some states have recognized this exception by way of legislation, *see, e.g.,* West Va.Code § 23–4–2 (Repl.Vol. 1985), while other states have done so by judicial fiat, *see, e.g., Beauchamp v. Dow Chemical Co.*, 427 Mich. 1, 9–11, 398 N.W. 2d 882, 886 (1986). To date, Virginia has not recognized such an exception. Recently, the Fourth Circuit had occasion to address, but declined to decide, whether Virginia courts would adopt the intentional tort exception. However, the Fourth Circuit wrote:

> The Virginia Workers' Compensation Act was modeled after the analogous statute in Indiana. Virginia courts have therefore considered decisions interpreting the Indiana Act in construing the substantially similar statute in Virginia. *Barksdale v. H.O. Engen, Inc.*, 218 Va. 496, 237 S.E.2d 794, 796 (1977). Indiana has adopted the majority rule limiting the intentional tort exception to conduct by an employer intended to injure the employee. Intentional acts which merely cause, but are not designed to produce, an injury, are within the coverage of the Act.

*Joyce v. A.C. and S., Inc.*, 785 F.2d 1200, 1207 (4th Cir.1986).

The *Joyce* court conducted an Indiana law analysis, and concluded:

> [E]ven under the Indiana rule, which would likely be followed by the Supreme Court of Virginia *in the event it decides to adopt an intentional tort exception* to its Workers' Compensation Act, Joyce's complaint fails to allege the sort of intentional conduct by DuPont that would remove his claim from the ambit of the Act.

*Id.* (Emphasis added).

Virginia law, as it currently stands, recognizes that claims resulting from the intentional acts of co-employees or third persons come within the jurisdiction of the Industrial Commission. *Continental Life Insurance Co. v. Gough*, 161 Va. 755, 172 S.E. 264 (1934).

In light of the fact that Virginia workers' compensation decisions are made with an eye toward Indiana law, it is quite conceivable and possible that the Virginia Supreme Court, when presented with this question, will recognize, as Indiana has, the intentional tort exception. It is, however, in this Court's estimation, more probable that it will not. The justification for this conclusion is that, as noted above, many state legislatures have recognized the exception by statute, and these, combined with the states which have recognized the exception by way of judicial decision, now create a majority. Because this information is available to this Court and other courts, it is rather obvious that the same information is available to the members of the Virginia General Assembly, the elected representatives of the Commonwealth. Armed with this knowledge though, the members of that body have not acted to recognize the exception. That inaction sends a message to this Court, and the message is that the members of the General Assembly have not, at least as yet, deemed it advisable to jump on the majority rule bandwagon.

Additionally, this Court recognizes that the creation of an exception to the exclusivity provision of the Workers' Compensation Act is a monumental step, and not one to be taken lightly. The Act is a result of compromise between employers and employees, and as such, the creation or recognition of an exception to the general rules of the Act must only be undertaken with an eye toward that compromise and the underlying purposes of the Act. The Virginia Supreme Court has written:

> [The Worker's Compensation Law] places upon industry as an expense of the business the pecuniary loss, measured by the compensation provided in the statute, attendant upon all accidents to employees within the hazards of the industry. It extends the employer's liability to all accidental personal injuries "arising out of and in the course of the employment," the expense of which is added to the cost of production. The employer surrenders his right of defense on the ground of contributory negligence and the common law doctrines of the assumption of risk and fellow servants. The rules of evidence are relaxed. The employee surrenders his right to a trial by jury and agrees to accept an arbitrary amount fixed by statute in lieu of compensation for the injuries sustained. He gains a wider security. The issue of negligence or non-negligence of the employer and the fellow servants is eliminated. Long, costly and delayed litigation is avoided. A smaller but speedier recovery is guaranteed.

*Feitig v. Chalkley*, 185 Va. 96, 98, 38 S.E. 2d 73, 73–74 (1946).

For the reasons stated above, this Court holds that, in accordance with the application of current Virginia law, the Virginia Workers' Compensation Act precludes Haigh from recovering for emotional distress in this forum.

(b) Haigh—Failure to State a Claim

In light of the Court's holding in the preceding section, this issue need not be addressed.

(c) Norma Haigh—Failure to State a Claim

Because Norma Haigh was not in a master-servant relationship with Panasonic, her claim for emotional distress is not subject to the exclusivity provision of the Virginia Workers' Compensation Act. However, defendants argue that her claim

must fail because their conduct, assuming the allegations concerning that conduct to be true, was not directed toward her.

In *Womack v. Eldridge*, 215 Va. 338, 342, 210 S.E.2d 145, 148 (1974), the Virginia Supreme Court held that a cause of action will lie for emotional distress, unaccompanied by physical injury, when four elements are shown: intentional or reckless conduct, outrageousness, a causal connection between the conduct and the emotional distress, and the existence of severe emotional distress. Moreover, in *Naccash v. Burger*, 223 Va. 406, 416, 290 S.E.2d 825, 830–31 (1982), the court upheld a third party claim for damages based upon emotional distress. There, the emotional distress was negligently inflicted, whereas here the allegation is that the infliction was intentional. However, nothing in *Naccash* would indicate that this distinction would result in a different outcome. As such, taking Norma Haigh's allegations as true, the Court finds that she has stated a claim upon which relief can be granted.

(d) Failure to State a Claim Against the Individual Defendants

██ As the Court reads defendants' argument, it appears that they have complaints about the specificity with which each individual defendant is accused of having inflicted emotional distress on the plaintiffs. The Second Amended Complaint, in accusing these defendants of committing this tort, references the claims presented in preceding counts. Each of the individual defendants, to one degree or another, is named in these counts.

Taken as true, the allegations of Count Thirteen, complete with references to other counts and paragraphs of the Complaint, state a claim upon which relief can be granted. As noted, the Court interprets defendants' concerns to be ones of specificity. Presumably, through discovery mechanisms, the individual defendants will be able to ascertain the existence of specific evidence, or the absence thereof. If the latter situation arises, the Court has no doubt that the defendants will come forward with a motion for summary judgment. At the present time, however, the

Court cannot say that Norma Haigh has not stated a claim against these individual defendants.

*Issue X*

Count Fifteen reads in pertinent part as follows:

Virginia Code, Section 40.1–27 makes it illegal for a former employer to take any action to prevent a former employee from obtaining subsequent employment. In view of Panasonic's, Wolfe's, Willner's, Latini's, Gold's, Weber's, Kellner's, Adamyk's, Berman's, and Kanow's actions concerning potential employers in general and Best Products and Luskin's, Inc. in particular, have willfully breached their duty, as set out in the above-referenced statute, to refrain from preventing Haigh from obtaining subsequent employment.

Second Amended Complaint, Paragraph 212.

██ Va.Code § 40.1–27 establishes criminal penalties for the willful and malicious prevention of the employment by others of a former employee. Defendants contend that Haigh has not stated a cause of action in Count Fifteen. They raise three arguments in support of this contention. First, they argue that Haigh does not allege that Best Products was a potential employer. Second, they contend that Haigh has not alleged that the defendants acted willfully or maliciously to prevent him from obtaining future employment with Luskin's, Inc. Third, defendants argue that Va.Code § 40.1–27 does not establish a private cause of action.

Taking the allegations as true, and reading the Complaint in its entirety, the Court finds that defendants' first two arguments are not sufficient on a Rule 12(b)(6) motion to form a basis for dismissal.

██ In reference to Va.Code § 40.1–27, the Court need not determine whether that Code section allows for a private cause of action. The Virginia Supreme Court has recognized a cause of action for interference with a prospective contract. *Allen Realty Corp. v. Holbert*, 227 Va. 441, 449,

318 S.E.2d 592, 597 (1984). Moreover, that court has written:

> Courts in other jurisdictions, however, have recognized a cause of action for interference with a prospective business or economic advantage even though no breach of contract was involved. Thus, the court in *Professional Investors Life Insurance Co. v. Roussel*, 528 F.Supp. 391, 399 (D.Kan.1981), summarized the elements of such a cause of action as follows: (1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and (4) damage to plaintiff. *See Bowl–Mor Co. v. Brunswick Corp.*, 297 A.2d 61 (Del.Ch.1972).

> Such claims have also been recognized in cases involving at-will contracts.

*Glass v. Glass*, 228 Va. 39, 51–52, 321 S.E. 2d 69, 76–77 (1984). *See also LaRouche v. National Broadcasting Co.*, 780 F.2d 1134, 1138–39 (4th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 79, 93 L.Ed.2d 34 (1986).

In *Glass*, the court went on to discuss the cause of action for interference with a business expectancy in light of the facts of that case, and recognized the existence of that tort in Virginia.

Here, Haigh alleges the existence of a business expectancy (employment with Best Products or Luskin's), with the probability of future economic benefit to him. He also satisfies the other three elements of the tort; namely, he details defendants' knowledge of the expectancy, his reasonable certainty that, absent the alleged misconduct, the expectancy would have come to fruition, and his injuries as a result of the alleged misconduct.

*Issue XI*

In Count Sixteen the plaintiffs seek an award of their costs of suit, including reasonable attorneys' fees. Defendants contend that this count must be dismissed because no cause of action exists for recovery of attorneys' fees and costs.

In response, plaintiffs state that their intent in aggregating the attorneys' fees claims in a single count was to simplify matters and give defendants a clear notice of their intent to recover attorneys' fees to the extent they are entitled thereto.

Throughout plaintiffs' Second Amended Complaint, they include a prayer for relief within each count, excluding attorneys' fees. The Court reads Count Sixteen to be nothing more than a generalized prayer for relief of attorneys' fees and costs, where applicable. As such, to the extent that Count Sixteen can be read as an attempt to state a cause of action, it will be dismissed. However, the language contained in Count Sixteen will be retained in the Complaint, and construed by this Court as a part of plaintiffs' prayer for relief.

## MOTION TO COMPEL

### *Background*

Defendants move for an order compelling discovery of certain tape recordings, and awarding expenses in connection thereto. The facts underlying the motion are as follows. Defendants made the usual request for production of documents in August 1987. Subsequently, during Haigh's deposition on October 21, 1987, he admitted that he had taped conversations with fifty-eight individuals. The tapes were made without the knowledge of these individuals, at Haigh's own initiative, and absent directives from Haigh's attorneys. Upon learning of their existence, defendants asked for the tapes. Plaintiffs turned over three tapes, which contained conversations with named defendants. Plaintiffs also surrendered a list of the names of the individuals who were on the recordings.

Defendants now seek the production of all the recordings. Plaintiffs argue that the tapes come within the work product privilege in that they were prepared in anticipation of litigation. Specifically, plaintiffs state that Haigh consulted legal counsel in December 1986, evidently fearing that defendants were trying to push him out of the company. Haigh considered himself constructively terminated in late

January 1987. On March 12, 1987, he filed an EEOC complaint. He states that between February 1987 and October 1987, he made the tape recordings. He delivered the cassette tapes to counsel for the plaintiffs within a day or two following each conversation, and the contents of such tapes were reviewed by counsel and used by counsel to prepare the Complaint and discovery requests.

This matter came before the Court on defendants' November 2, 1987 motion. The motion was briefed by the parties, and oral argument was held on November 13, 1987, at which time the Court directed counsel to submit additional memoranda addressed to the question whether the work product privilege had been vitiated. The parties have filed their memoranda, and the motion is now ripe for decision. Although several issues are raised by the parties, only two need to be addressed by this Court.

### Issues

Issue I—Are the tapes protected by the work product privilege?

Issue II—If the answer to the question in Issue I is yes, is the privilege vitiated in this case?

### Discussion

*Issue I*

 Federal Rule of Civil Procedure 26(b)(3) addresses the work product privilege. Basically, in order for the privilege to be applicable, the material must be (1) documents or tangible things, (2) prepared in anticipation of litigation or for trial, and (3) prepared by or for another party or by or for that other party's representative. Additionally, the question whether the material was prepared in anticipation of litigation does not turn on whether a suit had already been filed. *See, e.g., Home Insurance Co. v. Ballenger Corp.*, 74 F.R.D. 93, 101 (N.D.Ga.1977).

 In arguing that the work product privilege does not apply here, defendants make the following statement: "The tapes were made by a party to this action and apparently do not contain the thoughts and impressions of plaintiff's counsel, who was not involved in the conversations, and, therefore, cannot be considered attorneys' work product under the most liberal interpretation of that doctrine." Defendants' Memorandum, at 4.

Defendants are living in the past, and are presenting a pre–1970 argument. "The 1970 amendment [to Fed.R.Civ.P. 26] extends the work product protection to documents and things prepared for litigation or trial *by or for the adverse party himself* or his agent. Prior to the amendment some cases has [sic] held that documents of this kind were not within the immunity." 8 Wright and Miller, *Federal Practice and Procedure* § 2024 (1970) (emphasis added).

Moreover, in an identical situation, the United States District Court for the Southern District of New York held that a party's surreptitiously obtained tape recordings are protected under Fed.R.Civ.P. 26(b)(3), assuming that the statements were obtained and recorded in anticipation of litigation or in preparation for trial. *H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc.*, 108 F.R.D. 686, 690 (S.D.N.Y.1985).

Based upon the facts and arguments as now appearing before the Court, the Court is of the opinion that the work product privilege would apply to the tape recordings, and production would be denied unless the Court became convinced that defendants had a substantial need for the recordings and were unable to obtain their equivalent without undue hardship.

*Issue II*

 The Court need not delve into questions of "substantial need," "undue hardship," or "substantial equivalent." Fed.R.Civ.P. 26(b)(3). The Court holds that the work product privilege has, in this case, been vitiated.

In recent years, courts have come to recognize that "in some circumstances, a lawyer's unprofessional behavior may vitiate the work product privilege." *Moody v. Internal Revenue Service*, 654 F.2d 795, 800 (D.C.Cir.1981).

The *Moody* opinion was discussed by the Eleventh Circuit in *Parrott v. Wilson*, 707 F.2d 1262 (11th Cir.), *cert. denied*, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). There, plaintiff's attorney had clandestinely taped telephone conversations with two witnesses. Defendants moved to compel production of the recordings, and plaintiff objected on the ground that the tapes were work product under Fed.R.Civ.P. 26(b)(3). It is helpful to quote in length from that opinion.

> The [*Moody*] court reasoned that the purpose of the work product privilege is to protect the integrity of the adversary process; therefore, it would be improper to allow an attorney to exploit the privilege for ends that are antithetical to that process. 654 F.2d at 800. In the instant case, the record clearly demonstrates that counsel for the appellant clandestinely recorded conversations with witnesses. While this practice violates no law, the Code of Professional Conduct imposes a higher standard than mere legality. The American Bar Association's Committee on Ethics and Professional Responsibility has ruled that the recording of conversations of witnesses without their consent is unethical. *See* ABA Committee on Professional Responsibility, Formal Opinions, No. 337 (1974); *Id.*, Informal Opinions, No. 1320 (1975) (refusing to reconsider Formal Opinion No. 337). *See also* NYSBA, Committee on Professional Ethics, Opinions, No. 328 (1974).
>
> We are mindful of the client's interest in protecting against the disclosure of work product. However, we are unable to say that the disclosure in this case "traumatize[d] the adversary process more than the underlying legal misbehavior." 654 F.2d at 801. The only discernible effect of the disclosure was that the depositions of Sharp and Godfrey commenced with the playing of the taped conversations. We thus hold that whatever work product privilege might have existed was vitiated by counsel's clandestine recording of conversations with witnesses.

*Parrott v. Wilson*, 707 F.2d at 1271–72 (footnotes omitted).

Carrying the question a step further, one court has recognized the potential difficulties of the situation in which an attorney directs his client to engage in behavior that would be improper for the attorney. *H.L. Hayden Co. of New York, Inc., v. Siemens Medical Systems, Inc.*, 108 F.R.D. 686, 690 n. 5 (S.D.N.Y.1985). It is apparent to this Court that such a course of action on the part of an attorney would clearly be improper. ABA Comm. on Ethics and Professional Responsibility, Informal Op. 1320 (1975). *See also Id.*, Formal Op. 337 (1974).

In the instant situation, counsel for plaintiffs did not direct Haigh to undertake the clandestine recordings. As represented to this Court, he clearly initiated such conduct on his own, and he, of course, is not bound by the ethical strictures which bind his counsel.

This does not end the question, however. The Court is troubled by language contained in plaintiff's memorandum in response to the motion to compel.

> Haigh ... began a concerted effort to interview persons throughout the United States who may have relevant information relating to his legal claims. Between February 1987 and October 1987, Haigh has telephoned approximately fifty-eight (58) such persons and, in most instances, tape recorded the conversations. The cassette tapes were delivered to counsel for the plaintiffs within a day or two following each such conversation and the contents of such tapes reviewed by counsel. In many instances, the information obtained during such telephone conversations was used by plaintiffs' counsel to prepare the initial complaint, the first amended and restated complaint, and the second amended and restated complaint filed in this action. Counsel also used such information to prepare other discovery requests.

Plaintiffs' Memorandum and Response to Defendant's Motion to Compel, at 2.

While counsel did not tell Haigh to initiate or continue taping conversations, the old adage "actions speak louder than

words" comes to mind. Indeed, Haigh and his attorneys fell into a pattern of conduct whereby Haigh would tape conversations and almost immediately turn the tapes over to counsel for their use. This pattern of conduct continued over a period of approximately nine months, and included the taping of fifty-eight conversations.

The Court would not be so troubled if it were faced with the situation where a party, in his exuberance over pending litigation, pursued such a course of conduct and delivered a handful of tapes to his counsel. In that situation, the lawyer's conduct could fairly be described as simple acquiescence in the situation created by the client's exuberance. There is a point, however, where acquiescence ceases to be passive and noncommittal, and becomes active encouragement and affirmative support. There is, and can be, no bright line to determine when this point is reached. Instead, the circumstances of each case must be viewed in their totality in an attempt to get a fix on that point. Here, the Court is certain that that point has been crossed. As such, the Court holds that the work product privilege has been vitiated.

The ruling today should not be taken as an indictment of counsel's ethics or professionalism. To be sure, the law on this point is in an infant, perhaps even fetal, state. The Court in no way assumes or believes that counsel's intent was to run afoul of ethical strictures.

Additionally, it should be noted that this ruling may be interpreted by some as punishment for Haigh's retention of counsel. Indeed, if Haigh were proceeding pro se, the privilege would not be vitiated. However, an attorney's clients may not reap the benefits of the attorney's expertise in a vacuum-like state. Rather, the client must realize that the attorney is bound by a Code of Professional Responsibility, and, when he retains the attorney, he also retains the responsibilities imposed on that attorney.

## CONCLUSION

Defendants' motion to dismiss as to Count Four is DENIED.

Defendants' motion to dismiss as to Count Five is GRANTED, and Count Five is DISMISSED.

Defendants' motion to dismiss as to Count Six is GRANTED, and Count Six is DISMISSED.

Defendants' motion to dismiss as to Count Seven is DENIED.

Defendants' motion to dismiss as to Count Nine is GRANTED insofar as the allegation concerning an oral contract is concerned, and that part of the count is DISMISSED. The allegation concerning a written contract remains viable.

Defendants' motion to dismiss as to Count Ten is GRANTED, and Count Ten is DISMISSED.

Defendants' motion to dismiss as to Count Eleven is GRANTED, and Count Eleven is DISMISSED.

Defendants' motion to dismiss Count Twelve is DENIED insofar as the allegation regarding Haigh's refusal to participate in an illegal price-fixing scheme is concerned. The motion is GRANTED insofar as it relates to other allegations within the count (42 U.S.C. §§ 1981 and 1985, Title VII, the ADEA, ERISA, and the Virginians with Disabilities Act), and Count Twelve, to that extent, is DISMISSED.

Defendants' motion to dismiss Count Thirteen is DENIED as to Norma Haigh. The motion is GRANTED as to plaintiff Richard Haigh, and Count Thirteen is DISMISSED to that extent.

Defendants' motion to dismiss as to Count Fifteen is DENIED.

Defendants' motion to dismiss Count Sixteen is GRANTED insofar as Count Sixteen may be interpreted to state a separate cause of action for the recovery of attorneys' fees, and Count Sixteen in DISMISSED to that extent. The language in Count Sixteen, however, is retained in the Second Amended Complaint and will be construed by this Court as part of plaintiffs' prayer for relief.

Defendants' motion to compel the production of tape recordings is GRANTED, and plaintiffs are DIRECTED to produce

this material. Defendants' request for an award of expenses and attorneys' fees in reference to this motion is DENIED.

And it is so ORDERED.