**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CECILE M. LESCS,
<u>Plaintiff-Appellant,</u>

v.

WILLIAM R. HUGHES, INCORPORATED;
WILLIAM R. HUGHES; THE DOW
CHEMICAL COMPANY; DOWELANCO;
TENNECO OIL COMPANY; EXXON
CORPORATION,
<u>Defendants-Appellees,</u>

and

No. 97-2278

TENNECO, INC.,
<u>Defendant.</u>

AMERICAN CROP PROTECTION
ASSOCIATION; RESPONSIBLE
INDUSTRY FOR A SOUND
ENVIRONMENT; CHEMICAL
MANUFACTURERS ASSOCIATION;
NATIONAL PEST CONTROL
ASSOCIATION,
<u>Amici Curiae.</u>

Appeal from the United States District Court

for the Western District of Virginia, at Harrisonburg.

James C. Turk, District Judge.

(CA-94-30091)

Argued: October 29, 1998

Decided: January 14, 1999

Before WILKINSON, Chief Judge, WILLIAMS, Circuit Judge, and
THORNBURG, United States District Judge
for the Western District of North Carolina,
sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Brian Wolfman, PUBLIC CITIZENS LITIGATION
GROUP, Washington, D.C., for Appellant. Dean Taylor Barnhard,
BARNES & THORNBURG, Indianapolis, Indiana, for Appellees.
**ON BRIEF:** Douglas L. Stevick, PUBLIC CITIZENS LITIGATION
GROUP, Washington, D.C., for Appellant. H. Edmunds Coleman, III,
BRYAN & COLEMAN, P.L.C., Winchester, Virginia; Thomas H.
Rockwood, Winchester, Virginia, for Appellees. Lawrence S. Ebner,
MCKENNA & CUNEO, L.L.P., Washington, D.C., for Amici Curiae.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Cecile M. Lescs filed suit in federal district court seeking compen-
sation for her alleged injuries that resulted from exposure to a pesti-
cide that was applied to her residence. She sought compensation
under Virginia state law theories and asserted the federal court's
diversity jurisdiction. The district court dismissed several defendants
from the case early in the litigation. Upon a motion for summary
judgment by the remaining defendants, Dow Chemical Company
(Dow), William R. Hughes, and William R. Hughes, Inc. (collectively

2

Hughes), the district court dismissed Dow as a defendant and granted summary judgment to Hughes on a majority of the claims. The grant of summary judgment was based primarily on the district court's interpretation of 7 U.S.C.A. § 136v(b) (West Supp. 1998), the preemption provision of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), which expressly preempts state law that would place different or additional requirements on federally approved pesticide labeling or packaging. The district court allowed a single claim against Hughes for negligent application of the pesticide to proceed to trial. After trial, a jury determined that Hughes had not acted negligently, and accordingly, the district court entered judgment. Lescs appeals only the grant of summary judgment in favor of William R. Hughes, Inc. (Hughes, Inc.) and Dow, and the district court's action on a motion to compel production of documents. For the reasons stated herein, we affirm.

I.

On September 27, 1988, Cecile M. Lescs contracted to purchase a home in Winchester, Virginia. In conjunction with the closing, the seller employed Hughes to apply insecticide to the residence, which Hughes did on November 21, 1988. As part of the treatment, Hughes injected a pesticide called "Dursban" into the basement floor and exterior walls. Dursban is subject to the registration requirements of 7 U.S.C.A. § 136a (West Supp. 1998), as administered by the Environmental Protection Agency.

Two days after the Dursban application, Lescs noticed a "strong and potent" odor during a walk-through of the house. (J.A. at 183-84.) Because the odor was so strong, Lescs testified that she waited until January 25, 1989, to move into the house and only occasionally visited during the interim period to perform minor chores. She called Hughes's office twice before moving into the house to inquire about the odor and the insecticide treatment and, according to Lescs, the person with whom she spoke told her that the fumes were not dangerous.

After moving in, Lescs stated that she began to suffer severe maladies including nausea, vomiting, diarrhea, skin rash, nervousness, and irritability. During the time she lived in the residence, her dog died,

3

which prompted her to move out of the house on April 14, 1989, due to concerns about the cause of the dog's death and her own health. An examination of the dog, however, produced no conclusive evidence as to the cause of its death.

Lescs then contacted Dow for information about Dursban and spoke on various occasions with Ken Rose, a Dow technical expert. During one of these conversations, Lescs stated that Rose told her that Dursban, "when applied properly, . . . was okay to go into homes." (J.A. at 210-11.) Regarding ridding the house of excess Dursban, Rose instructed Lescs to wipe down the walls using a basic solution such as one made with Cheer brand detergent. Lescs returned to the house and attempted to decontaminate an upstairs bedroom in accordance with Rose's instructions but abandoned the attempt because she "would cough and [her] hands would burn." (J.A. at 200.)

In 1990 Lescs filed suit in Virginia state court seeking damages that she allegedly suffered from the Dursban application. On June 6, 1994, she took a voluntary nonsuit of that action. On December 5, 1994, Lescs brought suit against Dow Chemical Company, Dowelanco, Exxon Corporation, Tenneco, Inc., Tenneco Oil Company, William R. Hughes, Inc., Hughes and Company Pest Control, and William R. Hughes in the United States District Court for the Western District of Virginia, based again on damages that she allegedly suffered from Dursban exposure. By order dated June 5, 1995, the district court dismissed with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6), all of Lescs's claims against Dowelanco, Tenneco, Inc., Tenneco Oil Company, and Exxon Corporation, and dismissed the strict liability claims against the other defendants.[1] Hughes and Dow, the remaining defendants, moved for summary judgment on the unresolved claims. On August 8, 1997, the district court granted

_____

[1] "Hughes and Company Pest Control" is a trade name which was acquired by Pest Management on May 10, 1991, along with the assets of William R. Hughes, Inc. In an order dated June 2, 1995, the district court denied Lescs's motion to add Pest Management as a defendant, thereby removing Hughes and Company Pest Control as a defendant. Hughes, Inc. and William R. Hughes, individually, remained defendants and Lescs does not appeal the refusal to add Pest Management as a defendant.

4

Dow's motion for summary judgment, resolving all claims in favor of Dow. See Lescs v. Dow Chem. Co., 976 F. Supp. 393 (W.D. Va. 1997). Hughes's motion for summary judgment was granted in part and denied in part, leaving only one claim against Hughes for negligent application of the pesticide. See id. at 401. The negligent application action was tried before a jury beginning on August 25, 1997. The jury returned a verdict in favor of Hughes, and the district court entered final judgment in favor of all defendants on September 23, 1997.

Lescs does not appeal the dismissal in favor of Dowelanco, Tenneco, Inc., Tenneco Oil Company, and Exxon Corporation, nor does she contest the dismissal of the strict liability claims against Hughes or Dow. She does, however, contend that the district court improperly determined that several of the state law claims were preempted by federal law under the preemption provision of FIFRA, 7 U.S.C.A. § 136v(b) (West Supp. 1998), and that sufficient factual questions were presented to preserve her claims against Dow and William R. Hughes, Inc. (Hughes, Inc.).**2** Specifically, Lescs argues that the district court erred in granting summary judgment in favor of Dow and Hughes, Inc. on various state law claims of negligence, negligence per se, misrepresentation, negligent testing, and breach of an implied warranty of merchantability. Lescs also argues that the district court abused its discretion when it failed to rule on a motion by Lescs to compel the production of certain documents.

These arguments reduce to three questions. First, whether this Court's interpretation of 7 U.S.C.A. § 136v(b) (West Supp. 1998), the preemption clause of FIFRA, is still appropriate in light of the United States Supreme Court's holding in Medtronic, Inc. v. Lohr, 116 S. Ct. 2240 (1996), and, if it is, whether the district court properly applied the standard. Second, whether the district court improperly ignored Dow's violation of federally mandated standards, independent industry standards, and the breach of consumer expectations when it granted summary judgment in favor of Dow on the breach of implied warranty claim. Third, whether the district court improperly failed to rule upon Lescs's motion to compel discovery.

_____

**2** Lescs does not pursue any claims against William R. Hughes, individually, in this appeal.

5

We address each of these issues in turn.

II.

The first two issues involve a review of the district court's grant of summary judgment. "The appropriate standard of review for the granting of summary judgment is de novo." Cohn v. Bond, 953 F.2d 154, 157 (4th Cir. 1991). "[S]ummary judgment is proper `if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). Because this appeal of summary judgment hinges on determining whether federal law pre-empts state law claims, an issue of material fact appropriate for trial can arise only if the claim presented is not legally preempted.

There is, however, a firmly established jurisprudential presumption against the preemption of state law. See, e.g. , Rice v. Santa Fe Eleva-tor Corp., 331 U.S. 218, 230 (1947). Nevertheless, Congress may expressly preempt state law under the Supremacy Clause, assuming it acts within its constitutionally delegated authority. See U.S. Const., art. VI, § 2; Pacific Gas & Elec. Co. v. State Energy Resources Con-servation & Dev. Comm'n, 461 U.S. 190, 203 (1983); Rice, 331 U.S. at 230. If Congress statutorily expresses its intent to preempt state law, as in FIFRA, the only remaining inquiry is the scope of preemp-tion. See Cipollone v. Liggett Group, Inc., 505 U.S. 504, 532 (1992) (Blackmun, J., concurring in part and in the judgment, and dissenting in part). The FIFRA statutory preemption provision ensures the uni-formity of pesticide regulation by pronouncing that a "State shall not impose or continue in effect any requirements for labeling or packag-ing [of federally registered pesticides] in addition to or different from those required under [FIFRA]." 7 U.S.C.A.§ 136v(b) (West Supp. 1998). Thus, federal law clearly sends the message that it solely gov-erns the labeling and packaging of pesticides and that any state law affecting those requirements is preempted.

This Court has extensively explored the reach of the preemption language contained in § 136v(b). See Lowe v. Sporicidin Int'l, 47 F.3d 124 (4th Cir. 1995); Worm v. American Cyanimid Co., 5 F.3d 744

6

(4th Cir. 1993) (Worm II); Worm v. American Cyanimid Co., 970 F.2d 1301 (4th Cir. 1992) (Worm I). These cases made clear that state laws imposing different or additional requirements for pesticide labeling or packaging would be preempted. See Worm I, 970 F.2d at 1308.**3** To further define this general standard, we held that "common law causes of action alleging that the language of an EPA approved label failed to adequately warn of risks associated with pesticide are preempted," Worm II, 5 F.3d at 748, and that "any state law claim that would require the defendant to alter its EPA-approved warning label, labeling, or packaging to avoid liability is preempted," Lowe, 47 F.3d at 129. But these cases also recognized that FIFRA does not preempt state law that authorizes a claim for the "breach of a FIFRA-created duty." Id. at 129-30 (citing Worm II , 5 F.3d at 748). State law claims unrelated to labeling or packaging such as negligent testing, manufacturing, and formulating, also escape FIFRA's preemptive effect. See Worm II, 5 F.3d at 747. Applying these precedents to the facts of this case, the district court determined that the majority of Lescs's state law claims were preempted.

A.

On appeal, however, Lescs argues that we should reconsider our FIFRA preemption jurisprudence in light of the Supreme Court's decision in Medtronic, Inc. v. Lohr, 116 S. Ct. 2240 (1996) (plurality opinion), which involved statutes governing the regulation of medical devices. In a splintered opinion, a plurality of the Supreme Court determined that generally applicable state law, which did not specifically conflict with federal law, was not preempted. See Medtronic, 116 S. Ct. at 2251-53, 2257-58. Medtronic held that "pre-emption

_____

**3** Notably, every circuit that recently has addressed this question similarly has interpreted the extent of preemption mandated by FIFRA. See, e.g., Kuiper v. American Cyanamid Co., 131 F.3d 656, 662 (7th Cir. 1997), cert. denied, 118 S. Ct. 1839 (1998); Grenier v. Vermont Log Bldgs., Inc., 96 F.3d 559, 563 (1st Cir. 1996); Taylor AG Indus. v. Pure-Gro, 54 F.3d 555, 561 (9th Cir. 1995); Welchert v. American Cyanamid, Inc., 59 F.3d 69, 73 (8th Cir. 1995); MacDonald v. Monsanto Co., 27 F.3d 1021, 1024-25 (5th Cir. 1994); Papas v. Upjohn Co., 985 F.2d 516, 518 (11th Cir. 1993); Arkansas-Platte & Gulf Partnership v. Van Waters & Rogers, Inc., 981 F.2d 1177, 1179 (10th Cir. 1993).

occur[s] only where a particular state requirement threatens to inter- fere with a specific federal interest." Id. at 2257. The opinion, how- ever, did not interpret FIFRA, but the Medical Device Amendments of 1976 (MDA), 90 Stat. 539, which contained a preemption clause codified at 21 U.S.C.A. § 360k(a) (West Supp. 1998).**4** The preemp- tion provision analyzed in Medtronic differs from the one set forth in FIFRA in at least three respects. First, although it also applied to any "requirement" established by state law, it was not limited to merely labeling or packaging. Second, under subsection (b), the clause allowed the FDA to exempt state requirements from the effect of pre- emption. 21 U.S.C.A. § 360k(b) (West Supp. 1998) ("Upon applica- tion of a State . . ., the Secretary may, by regulation promulgated after notice and opportunity for an oral hearing, exempt from subsection (a) of this section . . . a requirement of such State . . . ."). Third, and perhaps most important, the Court found that the"language of [§ 360k was] not entirely clear." Medtronic, 116 S. Ct. at 2255; see also id. at 2260 (Breyer, J., concurring in part and concurring in the judgment) ("[T]he MDA's pre-emption provision is highly ambigu- ous."). Because these aspects of the statutory scheme differentiated the effect of the MDA preemption clause from the preemption clause contained in FIFRA and supported the Medtronic holding, we deter- mine that our interpretation of FIFRA's preemption clause remains unaffected.**5** Therefore we, as a panel, may not disturb the settled law of this Circuit.

_____

**4** That preemption clause read as follows:

> Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement--
>
> (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
>
> (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C.A. § 360k(a).

**5** We note that Justice Breyer agreed with the plurality in two of these three respects, thus adding the fifth vote to form a majority on at least two distinguishing points of the MDA preemption clause. See Medtronic

1.

In Medtronic, the principal opinion began its analysis with Congress's use of the word "requirement" and determined that giving the term broad effect would destroy virtually all remedies available under state law and would severely interfere with state sovereignty. See Medtronic, 116 S. Ct. at 2251-52. If Congress had intended such a broad effect, the plurality reasoned, then it would have used a term such as "remedy," which would have unambiguously achieved the same effect. See id. at 2251. Instead, based upon a reading of the entire statute, the plurality concluded that in using the term "requirement," Congress focused not on the preemption of broad common law causes of action, but on "specific, conflicting State statutes and regulations." Id. at 2252. The plurality, however, expended significant effort explaining that the language of the statute and its preemption clause was unusual in its effect, thus narrowing the extent of its operation. See id.

2.

A majority of the Court in Medtronic interpreted the preemption language through a review of the entire regulatory scheme established by the MDA, which broadly delegated authority to the FDA. "Congress has given the FDA a unique role in determining the scope of [the MDA's] pre-emptive effect." Id. at 2255. The principal opinion explained that the delegation of authority placed the FDA in a favorable position to judge whether state regulations would hinder the achievement of congressional goals. See id. at 2255-56. Accordingly, Congress provided the FDA with the authority to exempt state laws from the operation of the MDA's preemption clause. See 21 U.S.C.A. 360k(b); Medtronic, 116 S. Ct. at 2255.

_____

v. Lohr, 116 S. Ct. 2240, 2260 (1996) (Breyer, J., concurring in part and concurring in the judgment) (noting the important role that the FDA plays in interpreting the effect of preemption and the ambiguity of the preemption language). Thus, the majority holding depends upon the unique role of the FDA and the ambiguity of the preemption language in the MDA.

9

This unusual delegation of authority, combined with the reading of the statutory scheme as a whole, advanced in the principal opinion and which took into account both the use of the word "requirement" in other passages and the FDA's interpretation of the regulation, encouraged a departure from a plain reading of the preemption language itself, in favor of a reading that interpreted the broad statutory purpose:

> [Section] 360k refers to "requirements" many times throughout its text. In each instance, the word is linked with language suggesting that its focus is device-specific enactments of positive law by legislative or administrative bodies, not the application of general rules of common law by judges and juries. . . . Moreover, in subsection (b) the FDA is given authority to exclude certain "requirements" from the scope of the pre-emption statute. Of the limited number of "exemptions" from pre-emption that the FDA has granted, none even remotely resemble common-law claims.

Medtronic, 116 S. Ct. at 2252. The principal opinion, though not joined by a fifth Justice, thus reasoned that the overall structure of the statute mandated a narrow interpretation of the scope of preemption and found that common law claims regarding the regulated devices generally were not preempted by the MDA. See Medtronic, 116 S. Ct. at 2253.**6**

_____

**6** We note, however, that the plurality opinion in Medtronic did not preclude the possibility that common law actions could be preempted by the MDA, but reserved that question for a later day. See Medtronic, Inc. v. Lohr, 116 S. Ct. 2240, 2257, 2258-59 (1996). Five Justices, however, concluded that the term "requirements" encompassed common law claims. See id. at 2259-60 (Breyer, J., concurring in part and concurring in the judgment); id. at 2262 (O'Connor, J., joined by Rehnquist, C.J., Scalia & Thomas, J.J., concurring in part and dissenting in part); see also Grenier v. Vermont Log Bldgs., Inc., 96 F.3d 559, 563 (1st Cir. 1996) ("It was once an open question, but is now settled by the Supreme Court in Cipollone and [Medtronic], that `requirements' in this context presumptively includes state causes of action as well as laws and regulations."). Thus the majority position of the Supreme Court, to which we are bound, is that common law claims could in fact be preempted by the

10

3.

Importantly, however, the principle opinion in <u>Medtronic</u> made
clear that other statutory preemption schemes would not necessarily
be subject to the same interpretation. It specifically distinguished the
preemption statute at issue in <u>Cipollone v. Liggett Group</u>, 505 U.S.
504 (1992). In <u>Cipollone</u>, the Court interpreted the extent of preemp-
tion mandated by the Public Health Smoking Act of 1969, Pub. L. No.
91-222, 84 Stat. 87 (1969 Act), and the Federal Cigarette Labeling
and Advertising Act, Pub. L. No. 89-92, 79 Stat. 282 (1965) (1965 Act).**7**
<u>See Cipollone</u>, 505 U.S. at 514-15. Unlike the statute at issue in
<u>Medtronic</u>, the Court in <u>Cipollone</u> determined that the language of the
1969 Act extended federal preemption beyond "specific, conflicting
State statutes," <u>Medtronic</u>, 116 S. Ct. at 2252, to encompass common
law claims that relied on "omissions or inclusions in . . . advertising
or promotions," <u>Cipollone</u>, 505 U.S. at 530-31. Furthermore, the

_____

language used in the MDA. <u>Cf. O'Dell v. Netherland</u>, 95 F.3d 1214,
1224 (4th Cir. 1996) (noting that the principle of law resulting from a
plurality opinion is the narrowest holding agreed to by a majority of the
Court). A majority of the Court, therefore, does not call into question our
position that common law claims and enactments of positive law are
equally subject to preemption.

**7** Section 5 of the Federal Cigarette Labeling and Advertising Act con-
tained the following preemption provision:

> (a) No statement relating to smoking and health, other than
> the statement required by section 4 of this Act, shall be required
> on any cigarette package.

> (b) No statement relating to smoking and health shall be
> required in the advertising of any cigarettes the packages of
> which are labeled in conformity with the provisions of this Act.

§ 5, 79 Stat. at 283. Subsection (b) was amended by the Public Health
Smoking Act of 1969 to read as follows:

> (b) No requirement or prohibition based on smoking and health
> shall be imposed under State law with respect to the advertising
> or promotion of any cigarettes the packages of which are labeled
> in conformity with the provisions of this Act.

§ 5(b), 84 Stat. at 88.

11

smoking regulations did not grant substantial authority to a federal agency to determine the range of preemption. Therefore, the Court looked no further than the specific text of the preemption clause contained in the 1969 Act, which was unambiguous in expressing the scope of preemption. See id. at 521 ("`We must give effect to this plain language unless there is good reason to believe Congress intended the language to have some more restrictive meaning.'" (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 97 (1983))).

As Medtronic's principal opinion noted, the preemption clause in the 1969 Act specifically targeted "a limited set of state requirements -- those based on smoking and health -- and then only . . . a limited subset of the possible applications of those requirements -- those involving the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of the federal statute." Medtronic, 116 S. Ct. at 2252. Thus, the preemption language in the 1969 Act, unlike the language in the MDA, was clear as to its operation and was interpreted accordingly. See Cipollone, 505 U.S. at 523-24 ("[W]e must fairly but -- in light of the strong presumption against pre-emption -- narrowly construe the precise language of § 5(b) and we must look to each of petitioner's common-law claims to determine whether it is in fact pre-empted.")

From this analysis, we conclude that our established interpretation of the FIFRA preemption clause is unchanged by Medtronic. As we have stated previously, "both the statute contained in Cipollone and FIFRA contain similar preemption provisions as to labeling." Lowe, 47 F.3d at 129. But key to our determination is the text of the FIFRA preemption provision, which mandates its reach:"any requirements for labeling or packaging in addition to or different from those required under [FIFRA]." 7 U.S.C.A. § 136v(b); see Worm II, 5 F.3d at 747 (stating that like FIFRA, the statutes at issue in Cipollone "also contain explicit language addressing the preemptive scope of their labeling requirements"). FIFRA's language does not suggest some extraordinarily broad scope of preemption that extends beyond the statutory scheme. Nor does it work to destroy all means of redress for plaintiffs under the common law of a state. See Worm II, 5 F.3d at 747 (holding that common law claims unrelated to labeling or packaging are not preempted). In short, the statutory language clearly implements the narrow purpose of Congress to effect uniform labeling and

12

packaging of pesticides. Because the scope of FIFRA preemption is plain, it does not require a circuitous analysis to divine congressional intent. As we stated in Worm II, in accord with the guidance provided by Cipollone, this Court has "interpret[ed] the express language" when determining the scope of the FIFRA preemption clause. Id. We therefore disagree with Lescs's contention that the Medtronic holding compels a new interpretation of the FIFRA preemption clause.

B.

Despite this determination, however, we must still review whether the district court properly applied our interpretation of the scope of FIFRA preemption. As we stated at the outset, FIFRA preempts any state law, whether a positively enacted statute or a common law duty, that "would impose a labeling requirement inconsistent with those established by FIFRA." Worm I, 970 F.2d at 1308. Following this standard, we have held various claims to be preempted if they were based upon EPA-approved labeling language. Such claims have included a failure to warn, a breach of an express warranty or an implied warranty of merchantability, see Lowe , 47 F.3d at 129, 132, and a false representation, see Worm II, 5 F.3d at 748. Claims that relate to a product defect such as "negligent testing, manufacturing, and formulating" or that were based upon a state law allowing a claim for the breach of a FIFRA-created duty, however, generally are not preempted. Worm II, 5 F.3d at 747-48; see Lowe, 47 F.3d at 130 (noting a state law claim for the breach of a FIFRA-created duty, which prohibited claims about the product that substantially differed from statements in the registration statement, was not preempted). We now apply this analysis to Lescs's claims.

1.

Lescs first argues that her label-based claims, including negligent failure to warn, misbranding, and breach of an implied warranty of merchantability based on inadequate warnings on the label, are not preempted because they use compliance with federal law as the foundation for a state law claim under a negligence-per-se theory of liability. Lescs asserts that the Dursban label, approved under the FIFRA-mandated registration process, does not comply with certain aspects of FIFRA itself or with the regulations promulgated under its author-

13

ity. She thus concludes that "even if the court were correct in characterizing all of Ms. Lescs' negligence claims as labeling claims, they would not be preempted." (Appellant's Br. at 26.) This argument relies in part on Lescs's contention that Medtronic altered the landscape of preemption by allowing claims under general common law duties. Because we concluded that Medtronic did not alter our earlier holdings, this challenge to the grant of summary judgment need not detain us long.

As we stated in Worm II,

> If a state elects to recognize that a breach of a FIFRA-created duty forms the basis for a state remedy, we have held that it is permitted to do so by 7 U.S.C. § 136v(b). Allowing such actions, however, is substantially distinguishable from accepting the argument that the state common law duty to warn is not "in addition to or different from" the federally defined duty.

Worm II, 5 F.3d at 748 (citations omitted). Lescs's claims for misbranding, negligent failure to warn, or breach of an implied warranty of merchantability, all brought "under the theory that the pesticide lacked adequate warnings," (Appellant's Br. at 23), clearly "would require the defendant to alter its EPA-approved warning label, labeling, or packaging to avoid liability," Lowe , 47 F.3d at 129. The district court, therefore, properly concluded that these claims were preempted.

2.

Next, Lescs ambiguously alleges in her brief that Dow may also have violated other FIFRA requirements that were independent of the labeling standards. Because the enforcement of these standards would not impact the label, she argues that FIFRA's preemption provision would not prevent a state from allowing a negligence-per se claim to be based on the violation of these other FIFRA requirements. The only nonlabel-based FIFRA violation she specifically alleges, however, is Dow's failure to report instances of adverse health effects related to Dursban exposure in violation of 7 U.S.C.A. § 136d(a)(2) (West Supp. 1998) (requiring registrants to file reports concerning

14

"unreasonable adverse effects on the environment of the pesticide"). Even if Virginia recognized this violation of a federal statute as the basis for a state law negligence-per-se claim, our inquiry is not ended.

Under Virginia law, more is required than the mere violation of a statute to establish a negligence per se claim, because private citizens are not permitted the wholesale right to become enforcers of state and federal laws. A "violation of a statute constitutes negligence per se" only "if such negligence is a proximate or efficiently contributing cause of an injury." Esso Standard Oil Co. v. Williams, 117 S.E.2d 93, 95 (Va. 1960). To make a claim for negligence per se under Virginia law, a plaintiff must, therefore, not only prove the violation of a statute, but also causation and corresponding damages.

Lescs offers no evidence that her alleged injuries were caused by Dow's failure to report the adverse environmental effects of Dursban. She has thus not met her burden on an essential element of her claim and summary judgment is appropriate. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

3.

Further, Lescs urges claims of "misrepresentation" against both Dow and Hughes, Inc., based on the "general duty not to deceive" and argues that the district court improperly determined that these claims were preempted. (Appellant's Br. at 27, 29.) First, she alleges that an employee of Hughes, Inc. improperly stated that the Dursban "fumes were not dangerous." (Appellant's Br. at 28.) Second, she claims that Rose, the technical expert at Dow, made two improper statements, one as to the appropriateness of using Dursban in residences and the other regarding the proper method for decontaminating her house. Lescs contends that these claims are not preempted under our holding in Lowe, which permitted state law claims to stand if they related to statements that substantially differed from the language on the label.

This Court held in Lowe that a party could sue under a state law cause of action that would hold a defendant liable for violating a provision of FIFRA, specifically 7 U.S.C.A. § 136j(a)(1)(B) (West 1980), which states:

15

[I]t shall be unlawful for any person in any State to distribute [or] sell . . . to any person--

. . . .

(B) any registered pesticide if any claims made for it as a part of its distribution or sale substantially differ from any claims made for it as a part of the statement required in connection with its registration . . . .

7 U.S.C.A. § 136j(a)(1)(B); Lowe, 47 F.3d at 130. This holding was consistent with our interpretation of the FIFRA preemption clause as not affecting state law claims that based a cause of action upon the breach of a FIFRA-created duty. See Lowe, 47 F.3d at 129-30. We noted Maryland is not preempted from imposing common law liability for advertising statements that substantially differed from those made in the EPA registration statement, see id. at 130, which included the EPA-approved labeling, see 7 U.S.C.A.§ 136a(c)(5)(B) (West 1980). Equally as clear is this Court's conclusion that a claim challenging "the same language that constitutes an EPA-approved label, labeling, or packaging," is preempted. Lowe , 47 F.3d at 129 (citing Worm II, 5 F.3d at 748).

In this case, Lescs does not claim the breach of a FIFRA duty under a state common law theory of recovery recognized in Virginia, but instead, simply asserts that Dow and Hughes, Inc. both breached a general common law duty in the Commonwealth of Virginia not to misrepresent. We agree with the district court that Rose's statement to Lescs, "that he felt that when applied properly, that this chemical was okay to go into homes," (J.A. at 210-11), was not substantially different from the language on the label, and thus any claim based upon it was preempted. See Lescs v. Dow Chem. Co., 976 F. Supp. 393, 400 (W.D. Va. 1997). All of Lescs's claims under the theory of misrepresentation, however, must fail for a more basic reason.

Although not mentioned by the parties to this appeal, the federal courts of this Circuit repeatedly have determined that Virginia does not recognize a general cause of action for negligent misrepresentation. See Bentley v. Legent Corp., 849 F. Supp. 429, 434 (E.D. Va. 1994) ("Virginia does not recognize any tort of negligent

16

misrepresentation."), aff'd sub nom. Herman v. Legent Corp., 50 F.3d 6 (4th Cir. 1995); Joyce v. Lincoln Nat'l Life Ins. Co., 845 F. Supp. 353, 354 (E.D. Va. 1993) (same), aff'd sub nom. Joyce v. Benefits Mktg. Group, Inc., 32 F.3d 562 (4th Cir. 1994); Haigh v. Matsushita Elec. Corp. of Am., 676 F. Supp. 1332, 1349-50 (E.D. Va. 1987) (same). Because Lescs advances no valid theory of state law to support her claim, we must affirm the grant of summary judgment in favor of Dow and Hughes, Inc. on the misrepresentation claims.

4.

Lescs also argues that the district court erred by characterizing her negligent testing claim as a subset of other negligence claims and holding that they were collectively preempted. From a reading of the district court opinion, however, it is clear that the district court did not address negligent testing in its opinion. We do not assume, as Lescs does, that this omission was due to the district court's inclusion of the negligent testing claim with other causes of action. Whatever the district court's reasoning, this omission was appropriate because Lescs did not meet her burden under the pleading rules to present a claim for negligent testing.

Federal Rule of Civil Procedure 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "This portion of Rule 8 indicates the objective of the rules to avoid technicalities and to require that the pleading discharge the function of giving the opposing party fair notice of the nature and basis or grounds of the claim . . . ." 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1215 (1990). "Nevertheless, despite the more forgiving pleading standards, the essence of a claim remains its factual elements." Gilbane Bldg. Co. v. Federal Reserve Bank, 80 F.3d 895, 900 (4th Cir. 1996). Under Rule 8(a)(2), a claim will be acceptable only if a "plaintiff colorably states facts which, if proven, would entitle him to relief." Adams v. Bain, 697 F.2d 1213, 1216 (4th Cir. 1982).

A review of Lescs's complaint, including the page her counsel specifically referenced at oral argument, reveals only a brief mention of Dow's duty to properly test Dursban and a bare allegation that Dow

failed to properly design and manufacture Dursban. **8** During oral argument, Lescs's counsel asserted that a negligent testing claim is "similar to a design defect claim, but different." Despite our attempt to locate factual allegations that would give rise to a claim that Dow failed to properly test Dursban, the complaint fails even to state that Dow breached this duty, much less to assert facts that, if true, would tend to show that Dow breached its duty to test Dursban. Neither Dow nor the district court received proper notice of the claim.**9**

Our reading of Lescs's complaint reveals no factual allegations that would entitle Lescs to relief under a theory of negligent testing, nor does she point to any in her brief on appeal. We have no choice but to determine that Lescs failed to properly present a claim under a theory of negligent testing and thus her challenge to summary judgment on this point is without merit.

III.

The district court also granted summary judgment in favor of Dow on Lescs's claim that Dow breached the implied warranty of merchantability by marketing an unreasonably dangerous product.

Under Virginia law, to prove a breach of the implied warranty of merchantability, a plaintiff must show: "(1) that the goods were unreasonably dangerous for the use to which they would ordinarily be put or for some other reasonably foreseeable purpose, and (2) that the unreasonably dangerous condition existed when the goods left the manufacturer's hands." Morgen Indus., Inc. v. Vaughan, 471 S.E.2d 489, 492 (Va. 1996). Unreasonably dangerous is interpreted as "de-

_____

**8** We do note that in one of the numerous filings in the district court, Lescs did allege "the negligent failure to test adequately before putting said product upon the market," in reference to the defendants generally. (J.A. at 348.) But, this broad allegation was devoid of factual support.
**9** Further supporting our conclusion is Lescs's own statement to this Court in her reply brief: "Defendants did not even to [sic] mention Ms. Lescs' negligent testing claim in its summary judgment briefing in the court below, let alone present a factual argument on this theory. Nor did the district court refer to this claim in its summary judgment opinion." (Appellant's R. Br. at 12 (citations and footnotes omitted).)

18

fective in assembly or manufacture, unreasonably dangerous in design, or unaccompanied by adequate warnings concerning its hazardous properties." Id. A design defect can be proven if the product fails to meet government or industry standards or the reasonable expectations of consumers. See Alevromagiros v. Hechinger Co., 993 F.2d 417, 420 (4th Cir. 1993) (interpreting Virginia law). Lescs does not complain of a manufacturing defect and any claim based on inadequate warnings is preempted, leaving only a claim for a design defect. But as we explain, there is no proof that Dursban failed to meet either government standards, industry standards, or consumer expectations.

Lescs's only argument that Dow violated government standards consists of her contentions that Dursban was misbranded, and that Dow did not submit reports of adverse health effects caused by Dursban. As we have already explained in Part II.A, claims that would require the placement of different or additional requirements on the label are preempted. And, in Part II.B.2, we explained that there was no causal link established between Lescs's claimed injuries and a failure to report the adverse effects of Dursban on the environment. Furthermore, we fail to see how government reporting requirements relate to the product's design. Thus, Lescs cannot successfully pursue her claim for the breach of the implied warranty of merchantability on these grounds.

The contention that Dursban failed to meet consumer expectations must also fail. "Consumer expectations, which may differ from government or industry standards, can be established through evidence of actual industry practices, . . . published literature, and from direct evidence of what reasonable purchasers considered defective." Alevromagiros, 993 F.2d at 420-21 (internal quotation marks omitted). Despite the fact that consumer expectations might deviate from government mandated standards, certainly the existence of those standards, especially when they relate to the content of product information, bears on reasonable expectations. As the district court pointed out, the warning label is approved by the EPA and it would be anomalous to hold "`that a consumer is entitled to expect a product to perform more safely than its government-mandated warnings indicate.'" Lescs, 976 F. Supp. at 399 (quoting Papike v. Tambrands Inc., 107 F.3d 737, 743 (9th Cir.), cert. denied, 118 S. Ct. 166 (1997)). More-

19

over, Lescs has produced no information about actual industry practices, literature, or direct evidence of reasonable consumer expectations that would support her contention that Dursban failed this standard. There is no evidence that Dursban failed to meet consumer expectations.

Lastly, Lescs offers two theories to support her contention that Dow failed to meet industry standards in its production of Dursban. She first argues that the Chemical Manufacturers Association (CMA) Responsible Care Progress Report for 1995-1996 (CMA Report) establishes standards with which Dow failed to comply.[10] As Dow points out, there are obstacles to using the CMA Report as a basis for determining whether Dow followed industry standards. To begin with, the report relates not to the time period during which the relevant events occurred, but instead relates to 1995-1996. Virginia law requires that any standards asserted be those "existing when the [product] was manufactured."[11] Mears v. General Motors Corp., 896 F. Supp. 548, 551 (E.D. Va. 1995) (interpreting Virginia law). For this reason alone, the report is irrelevant and does not support Lescs's claim. In addition, however, a review of the CMA Report reveals little in the way of recognizable standards.[12] See Greene v. Boddie-Noell Enters., 966 F. Supp. 416, 419 (1997) (noting a "plaintiff's obligation

_____

[10] We note the question raised as to whether the CMA Report was admitted by the district court and thus properly a part of the record on appeal. Because we determine that this report would not support Lescs's claims even if it were admitted, we have no need to resolve this issue.

[11] We decline Lescs's invitation to visit a CMA website for the purpose of authenticating the CMA Report or determining what CMA standards existed during the relevant time period.

[12] Lescs highlights various "standards" in the CMA Report: "`produce chemicals that can be . . . used . . . safely;' to `make health, safety and environmental considerations a priority in our planning for all existing and new products and processes;' to `report promptly to officials, employees, customers and the public, information on chemical-related health and environmental hazards and to recommend protective measures;' and `to extend knowledge by conducting or supporting research on the health, safety and environmental effects of our products.'" (Appellant's Br. at 33-34.) To put it mildly, this language paints with a broad brush.

20

to demonstrate . . . proof that the defendant breached a recognizable standard").

Lescs's second theory on the manner in which Dow violated industry standards borders on frivolous. Without revealing with which industry standard Dow failed to comply, Lescs summarily asserts that the inclusion of xylene range solvent in Dursban was inappropriate because a label then in effect for one manufacturer's concentrated xylene product stated that it was "for industrial use only." (J.A. at 472.) This assertion fails to recognize that the EPA approved warning label for Dursban took into account all of its components. Common sense alone would dictate that the hazardous propensities of a chemical may vary greatly according to its dilution and potential interaction with other components. In other contexts, such as OSHA regulations, the federal government has recognized this fact. See 29 C.F.R. § 1910.1200(d)(5)(i), (ii) (1998) (stating that a solution is only considered to manifest the same health risks as its component parts if the solution is not tested as a whole). We find no industry standard that Dow violated by including a xylene range solvent in Dursban.

In summary, the district court properly granted summary judgment in favor of Dow on Lescs's contention that Dow breached the implied warranty of merchantability. There is insufficient evidence that Dow failed to meet government standards, industry standards, or consumer expectations in its production and sale of Dursban.

IV.

Lescs's final complaint is that the district court failed to rule on her second motion to compel production of documents, which was filed on May 17, 1996 (May 17, 1996 motion). Because this issue involves the district court's control over the discovery process, the district court will be reversed only upon a finding that the court abused its discretion. See Cohn v. Bond, 953 F.3d 154, 157 (4th Cir. 1991); Worm II, 5 F.3d 744, 749 (4th Cir. 1993).

On May 21, 1997, the district court entered an order (May 21, 1997 order) denying Lescs's motion to reopen discovery stating: "Plaintiff has already had ample opportunity for proper discovery. The court believes that Defendants will be unfairly prejudiced by any further

21

discovery." (J.A. at 391 (emphasis added).) This order referred directly to a motion filed by Lescs on April 14, 1997, which was entitled: "Motion to Reopen Discovery, Allow Additional Experts and Expansion of Opinions of Existing Experts, to Amend the Pleadings, For Deferral of Decisions on all Existing Motions Pending Such Additional Discovery and for Other Relief by Cecile M. Lescs" (April 14, 1997, motion). (J.A. at 17.) The May 17, 1996 motion, which is the subject of Lescs's argument, was filed approximately a year prior to the court's May 21, 1997 order. Based on the wording of the May 21, 1997 order, however, it disposed of all outstanding discovery issues, not just the April 14, 1997 motion -- noting its reasoning that Lescs already had ample opportunity for discovery.

The May 21, 1997 order adequately disposed of all outstanding motions to compel discovery and reflects no abuse of discretion. There is no cause to remand this issue to the district court.

V.

For the reasons stated herein, we affirm the judgment of the district court.

AFFIRMED

22